# HICKLIN ET AL. v. ORBECK, COMMISSIONER, DEPARTMENT OF LABOR OF ALASKA, ET AL.

No. 77–324.   Argued March 21, 1978—Decided June 22, 1978

BRENNAN, J., delivered the opinion for a unanimous Court.

*Robert H. Wagstaff* argued the cause for appellants. With him on the briefs was *Lee S. Glass.*

*Ronald W. Lorensen,* Assistant Attorney General of Alaska, argued the cause and filed a brief for appellees.*

*Briefs of *amici curiae* urging reversal were filed by *Edwin Vieira, Jr.,* for the National Right to Work Legal Defense Foundation; and by Peabody Testing—Bill Miller X-Ray, Inc.

*Ronald Y. Amemiya,* Attorney General, and *Lawrence D. Kumabe* and *Michael A. Lilly,* Deputy Attorneys General, filed a brief for the State of Hawaii as *amicus curiae* urging affirmance.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

In 1972, professedly for the purpose of reducing unemployment in the State, the Alaska Legislature passed an Act entitled "Local Hire Under State Leases." Alaska Stat. Ann. §§ 38.40.010 to 38.40.090 (1977). The key provision of "Alaska Hire," as the Act has come to be known, is the requirement that "all oil and gas leases, easements or right-of-way permits for oil or gas pipeline purposes, unitization agreements, or any renegotiation of any of the preceding to which the state is a party" contain a provision "requiring the employment of qualified Alaska residents" in preference to nonresidents.[1] Alaska Stat. Ann. § 38.40.030 (a) (1977).[2] This employment preference is administered by providing persons meeting the statutory requirements for Alaskan residency with certificates of residence—"resident cards"—that can be presented to an employer covered by the Act as proof of residency. 8 Alaska Admin. Code 35.015 (1977). Appellants, individuals desirous of securing jobs covered by the Act but unable to qualify for the necessary resident cards, challenge Alaska Hire as violative of

---

[1] The regulations implementing the Act further require that all non-residents be laid off before any resident "working in the same trade or craft" is terminated: "[T]he nonresident may be retained only if no resident employee is qualified to fill the position." 8 Alaska Admin. Code 35.011 (1977). See also 8 Alaska Admin. Code 35.042 (4) (1977).

[2] The complete text of § 38.40.030 (a) is as follows:

"In order to create, protect and preserve the right of Alaska residents to employment, the commissioner of natural resources shall incorporate into all oil and gas leases, easements or right-of-way permits for oil or gas pipeline purposes, unitization agreements, or any renegotiation of any of the preceding to which the state is a party, provisions requiring the lessee to comply with applicable laws and regulations with regard to the employment of Alaska residents, a provision requiring the employment of qualified Alaska residents, a provision prohibiting discrimination against Alaska residents and, when in the determination of the commissioner of natural resources it is practicable, a provision requiring compliance with the Alaska Plan, all in accordance with the provisions of this chapter."

both the Privileges and Immunities Clause of Art. IV, § 2, and the Equal Protection Clause of the Fourteenth Amendment.

## I

Although enacted in 1972, Alaska Hire was not seriously enforced until 1975, when construction on the Trans-Alaska Pipeline [3] was reaching its peak. At that time, the State Department of Labor began issuing residency cards and limiting to resident cardholders the dispatchment to oil pipeline jobs. On March 1, 1976, in response to "numerous complaints alleging that persons who are not Alaska residents have been dispatched on pipeline jobs when *qualified* Alaska residents were available to fill the jobs," Executive Order #76-1, Alaska Dept. of Labor (Mar. 1, 1976) (emphasis in original), Edmund Orbeck, the Commissioner of Labor and one of the appellees here, issued a cease-and-desist order to all unions supplying pipeline workers [4] enjoining them "to respond to all open job calls by dispatching *all qualified* Alaska residents before *any* non-residents are dispatched." *Ibid.* (emphasis in original). As a result, the appellants, all but one of whom had previously worked on the pipeline, were prevented from obtaining pipeline-related work. Consequently, on April 28, 1976, appellants filed a complaint in the Superior Court in Anchorage seeking declaratory and injunctive relief against enforcement of Alaska Hire.

At the time the suit was filed, the provision setting forth the qualifications for Alaskan residency for purposes of Alaska

---

[3] See *Trans Alaska Pipeline Rate Cases*, 436 U. S. 631 (1978); Trans-Alaska Pipeline Authorization Act, 87 Stat. 584, 43 U. S. C. § 1651 *et seq.* (1970 ed., Supp. V).

[4] App. 13–14. The vast majority of pipeline jobs were filled through union dispatchment. Deposition of David Finrow, Deputy Director of the Wage and Hour Division of the Alaska Dept. of Labor, in No. 3025 (Sup. Ct. Alaska), pp. 18–19, 28, 48.

Hire, Alaska Stat. Ann. § 38.40.090,[5] included a one-year durational residency requirement. Appellants attacked that requirement as well as the flat employment preference given by Alaska Hire to state residents. By agreement of the parties, consideration of a motion for a preliminary injunction was consolidated with the determination of the suit on its merits. The case was submitted on affidavits, depositions, and memoranda of law; no oral testimony was taken. On July 21, 1976, the Superior Court upheld Alaska Hire in its entirety and denied appellants all relief. On appeal, the Alaska Supreme Court unanimously held that Alaska Hire's one-year durational residency requirement was unconstitutional under both the state and federal Equal Protection Clauses, 565 P. 2d 159, 165 (1977), and held further that a durational residency requirement in excess of 30 days was constitutionally infirm. *Id.*, at 171.[6] By a vote of 3 to 2, however, the court held that the Act's general preference for Alaska residents was constitutionally permissible. Appellants appealed the State Supreme Court's judgment insofar as it embodied the latter holding, and we noted probable jurisdiction. 434 U. S. 919 (1977). We reverse.

---

[5] Section 38.40.090 provides:

"In this chapter

"(1) 'resident' means a person who

"(A) except for brief intervals, military service, attendance at an educational or training institution, or for absences for good cause, is physically present in the state for a period of one year immediately before the time his status is determined;

"(B) maintains a place of residence in the state;

"(C) has established residency for voting purposes in the state;

"(D) has not, within the period of required residency, claimed residency in another state; and

"(E) shows by all attending circumstances that his intent is to make Alaska his permanent residence."

[6] Appellees have not cross-appealed this portion of the Alaska Supreme Court's decision, which rests upon an independent and adequate state ground. *Murdock* v. *Memphis*, 20 Wall. 590 (1875).

## II

Preliminarily, we hold that this case is not moot. Despite the Alaska Supreme Court's invalidation of the one-year durational residency requirement, a controversy still exists between at least five of the appellants—Tommy Ray Woodruff, Frederick A. Mathers, Emmett Ray, Betty Cloud, and Joseph G. O'Brien—and the state appellees. These five appellants have all sworn that they are not residents of Alaska, Record 43, 47, 49, 96, 124. Therefore, none of them can satisfy the element of the definition of "resident" under § 38.40.090 (1) (D) that requires that an individual "has not, within the period of required residency, claimed residency in another state." They thus have a continuing interest in restraining the enforcement of Alaska Hire's discrimination in favor of residents of that State.[7]

Appellants' principal challenge to Alaska Hire is made under the Privileges and Immunities Clause of Art. IV, § 2: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." That provision, which "appears in the so-called States' Relations Article, the same Article that embraces the Full Faith and Credit Clause, the Extradition Clause . . . , the provisions for the admission of new States, the Territory and Property Clause, and the Guarantee Clause," *Baldwin* v. *Montana Fish and Game Comm'n,* 436 U. S. 371, 379 (1978), "establishes a norm of comity," *Austin* v. *New Hampshire,* 420 U. S. 656, 660 (1975), that is to prevail among the States with respect to their treat-

---

[7] As to the remaining three appellants—Sidney S. Hicklin, Ruby E. Dorman, and Harry A. Browning—the case does appear moot. At the time this suit was instituted, all three claimed to be Alaskan residents, but none had lived in the State continuously for one year. Record 45, 51–52, 126–127. Consequently, the only aspect of Alaska Hire they challenged was the Act's one-year durational residency requirement. When this requirement was held invalid by the Alaska Supreme Court, their controversy with the appellees seems to have terminated.

ment of each other's residents.[8]   The purpose of the Clause, as described in *Paul* v. *Virginia,* 8 Wall. 168, 180 (1869), is

> "to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned. It relieves them from the disabilities of alienage in other States; it inhibits discriminating legislation against them by other States; it gives them the right of free ingress into other States, and egress from them; it insures to them in other States the same freedom possessed by the citizens of those States in the acquisition and enjoyment of property and in the pursuit of happiness; and it secures to them in other States the equal protection of their laws.   It has been justly said that no provision in the Constitution has tended so strongly to constitute the citizens of the United States one people as this."

Appellants' appeal to the protection of the Clause is strongly supported by this Court's decisions holding violative of the Clause state discrimination against nonresidents seeking to ply their trade, practice their occupation, or pursue a common calling within the State.   For example, in *Ward* v. *Maryland,* 12 Wall. 418 (1871), a Maryland statute regulating the sale of most goods in the city of Baltimore fell to the privileges and immunities challenge of a New Jersey resident against whom the law discriminated.   The statute discrimi-

---

[8] Although this Court has not always equated state residency with state citizenship, compare *Travis* v. *Yale & Towne Mfg. Co.,* 252 U. S. 60, 78–79 (1920), and *Blake* v. *McClung,* 172 U. S. 239, 246–247 (1898), with *Southern R. Co.* v. *Mayfield,* 340 U. S. 1, 3–4 (1950); *Douglas* v. *New Haven R. Co.,* 279 U. S. 377, 386–387 (1929); and *La Tourette* v. *McMaster,* 248 U. S. 465, 469–470 (1919), it is now established that the terms "citizen" and "resident" are "essentially interchangeable," *Austin* v. *New Hampshire,* 420 U. S. 656, 662 n. 8 (1975), for purposes of analysis of most cases under the Privileges and Immunities Clause of Art. IV, § 2. See *Toomer* v. *Witsell,* 334 U. S. 385, 397 (1948).

nated against nonresidents of Maryland in several ways: It required nonresident merchants to obtain licenses in order to practice their trade without requiring the same of certain similarly situated Maryland merchants; it charged nonresidents a higher license fee than those Maryland residents who were required to secure licenses; and it prohibited both resident and nonresident merchants from using nonresident salesmen, other than their regular employees, to sell their goods in the city. In holding that the statute violated the Privileges and Immunities Clause, the Court observed that "the clause plainly and unmistakably secures and protects the right of a citizen of one State to pass into any other State of the Union for the purpose of engaging in lawful commerce, trade, or business without molestation." *Id.*, at 430. *Ward* thus recognized that a resident of one State is constitutionally entitled to travel to another State for purposes of employment free from discriminatory restrictions in favor of state residents imposed by the other State.

Again, *Toomer* v. *Witsell*, 334 U. S. 385 (1948), the leading modern exposition of the limitations the Clause places on a State's power to bias employment opportunities in favor of its own residents, invalidated a South Carolina statute that required nonresidents to pay a fee 100 times greater than that paid by residents for a license to shrimp commercially in the three-mile maritime belt off the coast of that State. The Court reasoned that although the Privileges and Immunities Clause "does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for it," *id.*, at 396, "[i]t does bar discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States." *Ibid.* A "substantial reason for the discrimination" would not exist, the Court explained, "unless there is something to indicate that noncitizens constitute a peculiar source of the evil at which the

[discriminatory] statute is aimed." *Id.,* at 398. Moreover, even where the presence or activity of nonresidents causes or exacerbates the problem the State seeks to remedy, there must be a "reasonable relationship between the danger represented by non-citizens, as a class, and the . . . discrimination practiced upon them." *Id.,* at 399. *Toomer*'s analytical framework was confirmed in *Mullaney* v. *Anderson,* 342 U. S. 415 (1952), where it was applied to invalidate a scheme used by the Territory of Alaska for the licensing of commercial fishermen in territorial waters; under that scheme residents paid a license fee of only $5 while nonresidents were charged $50.

Even assuming that a State may validly attempt to alleviate its unemployment problem by requiring private employers within the State to discriminate against non-residents—an assumption made at least dubious by *Ward* [9]— it is clear that under the *Toomer* analysis reaffirmed in *Mullaney,* Alaska Hire's discrimination against nonresidents cannot withstand scrutiny under the Privileges and Immunities Clause. For although the statute may not violate the Clause if the State shows "something to indicate that non-citizens constitute a peculiar source of the evil at which the statute is aimed," *Toomer* v. *Witsell, supra,* at 398, and, beyond this, the State "has no burden to prove that its laws are not violative of the . . . Clause," *Baldwin* v. *Montana Fish and Game Comm'n,* 436 U. S., at 402 (BRENNAN, J., dissenting), certainly no showing was made on this record that nonresidents were "a peculiar source of the evil" Alaska Hire was enacted to remedy, namely, Alaska's "uniquely high unemployment." Alaska Stat. Ann. § 38.40.020 (1977). What evidence the record does contain indicates that the major cause of Alaska's high unemployment was not the influx of nonresidents seeking employment, but rather the fact that a substantial number of Alaska's jobless residents—especially the unemployed Eskimo and Indian residents—were unable to

---

[9] Cf. *Edwards* v. *California,* 314 U. S. 160 (1941).

secure employment either because of their lack of education and job training or because of their geographical remoteness from job opportunities;[10] and that the employment of nonresidents threatened to deny jobs to Alaska residents only to the extent that jobs for which untrained residents were being prepared might be filled by nonresidents before the residents' training was completed.

Moreover, even if the State's showing is accepted as sufficient to indicate that nonresidents were "a peculiar source of evil," *Toomer* and *Mullaney* compel the conclusion that Alaska Hire nevertheless fails to pass constitutional muster. For the discrimination the Act works against nonresidents does not bear a substantial relationship to the particular "evil" they are said to present. Alaska Hire simply grants all Alaskans, regardless of their employment status, education, or training, a flat employment preference for all jobs covered by the Act. A highly skilled and educated resident who has never been unemployed is entitled to precisely the same preferential treatment as the unskilled, habitually unemployed Arctic Eskimo enrolled in a job-training program. If

---

[10] For example, a report quoted in the State's Memorandum in Opposition to Plaintiffs' Motion for Partial Preliminary Injunction and Second Motion for Preliminary Injunction, Record 58, observed:

"The skill levels of in-migrants and seasonal workers are generally higher than those of the unemployed or under-employed resident workers. *Their ability to command jobs in Alaska is a sympton of, rather than the cause of conditions resulting in high unemployment rates,* particularly among Alaska Natives. Those who need the jobs the most tend to be undereducated, untrained, or living in areas of the state remote from job opportunities. Unless unemployed residents—most of whom are Eskimos and Indians—have access to job markets and receive the education and training required to fit them into Alaska's increasingly technological economy and unless there is a restructuring of labor demands, new jobs will continue to be filled by persons from other states who have the necessary qualifications." Federal Field Committee for Development Planning in Alaska, Economic Outlook for Alaska 311–312 (1971) (emphasis added; footnote omitted).

Alaska is to attempt to ease its unemployment problem by forcing employers within the State to discriminate against nonresidents—again, a policy which may present serious constitutional questions—the means by which it does so must be more closely tailored to aid the unemployed the Act is intended to benefit. Even if a statute granting an employment preference to unemployed residents or to residents enrolled in job-training programs might be permissible, Alaska Hire's across-the-board grant of a job preference to all Alaskan residents clearly is not.

Relying on *McCready* v. *Virginia*, 94 U. S. 391 (1877), however, Alaska contends that because the oil and gas that are the subject of Alaska Hire are *owned* by the State,[11] this ownership, of itself, is sufficient justification for the Act's discrimination against nonresidents, and takes the Act totally without the scope of the Privileges and Immunities Clause. As the State sees it "the privileges and immunities clause [does] not apply, and was never meant to apply, to decisions by the states as to how they would permit, if at all, the use and distribution of the natural resources which they own . . . ." Brief for Appellees 20 n. 14. We do not agree that the fact that a State owns a resource, of itself, completely removes a law concerning that resource from the prohibitions of the Clause. Although some courts, including the court below, have read *McCready* as creating an "exception" to the Privileges and Immunities Clause, we have just recently confirmed that "[i]n more recent years . . . the Court has recognized

---

[11] At the time Alaska was admitted into the Union on January 3, 1959, 99% of all land within Alaska's borders was owned by the Federal Government. In becoming a State, Alaska was granted and became entitled to select approximately 103 million acres of those federal lands. Alaska Statehood Law, 72 Stat. 340, § 6, note preceding 48 U. S. C. § 21. The selection process is not yet complete, but since 1959 large portions of land have been conveyed to the State, in fee, by the Federal Government. Full title to those lands and to the minerals on and below them is vested in the State. 72 Stat. 342, § 6 (i), note preceding 48 U. S. C. § 21.

that the States' interest in regulating and controlling those things they claim to 'own' . . . is by no means absolute." *Baldwin* v. *Montana Fish and Game Comm'n,* 436 U. S., at 385. Rather than placing a statute completely beyond the Clause, a State's ownership of the property with which the statute is concerned is a factor—although often the crucial factor—to be considered in evaluating whether the statute's discrimination against noncitizens violates the Clause. Dispositive though this factor may be in many cases in which a State discriminates against nonresidents, it is not dispositive here.

The reason is that Alaska has little or no proprietary interest in much of the activity swept within the ambit of Alaska Hire; and the connection of the State's oil and gas with much of the covered activity is sufficiently attenuated so that it cannot justifiably be the basis for requiring private employers to discriminate against nonresidents. The extensive reach of Alaska Hire is set out in Alaska Stat. Ann. § 38.40.050 (a) (1977). That section provides:

> "The provisions of this chapter apply to *all employment which is a result* of oil and gas leases, easements, leases or right-of-way permits *for oil or gas pipeline purposes,* unitization agreements [12] or any renegotiation of any of the preceding to which the state is a party after July 7, 1972; however, the activity which generates the employment must take place inside the state and it must

---

[12] The term "unitization agreement" is not defined in the Act. Alaska's Commissioner of Natural Resources gave the following definition of the term:

"Well, unitization agreement is an agreement between the operators and any given oil field as to the equity that each of them would have with respect to the oil and gas resources in that field. And in some cases that word is used to also include something called the 'Plan of Operations', which sets out the way in which an oil field or gas field would be operated pursuant to the State's conservation laws." Deposition of Guy R. Martin in No. 3025 (Sup. Ct. Alaska), p. 5.

take place either on the property under the control of the person subject to this chapter *or be directly related to activity taking place on the property under his control* and the activity must be performed directly for the person subject to this chapter *or his contractor or a subcontractor of his contractor or a supplier of his contractor or subcontractor."* (Emphasis added.)

Under this provision, Alaska Hire extends to employers who have no connection whatsoever with the State's oil and gas, perform no work on state land, have no contractual relationship with the State, and receive no payment from the State. The Act goes so far as to reach suppliers who provide goods or services to subcontractors who, in turn, perform work for contractors despite the fact that none of these employers may themselves have direct dealings with the State's oil and gas or ever set foot on state land.[13] Moreover, the Act's coverage is not limited to activities connected with the extraction of Alaska's oil and gas.[14] It encompasses, as emphasized by the dissent below, "employment opportunities at refineries and in distribution systems utilizing oil and gas obtained under Alaska leases." 565 P. 2d, at 171. The only limit of any consequence on the Act's reach is the requirement that "the

---

[13] According to one of the administrative regulations implementing Alaska Hire, "[s]uppliers shall have the same hiring requirements as an employer covered by this chapter, as to that portion of their supply business that is the result of a project or activity of a lessee, contractor or subcontractor." 8 Alaska Admin. Code 35.080 (a) (1977).

[14] The Commissioner of Natural Resources expressed this understanding of the scope of the Act:

*Mr. Martin:* ". . . I think it would cover relationships such as anything on a work pad or an associated construction road or possibly a site for a support camp or construction camp."

*Mr. Wagstaff* (attorney for appellants): "What about things such as docks if shipping is being used?"

*Mr. Martin:* "I would think that it could possibly include that." Deposition of Guy R. Martin, *supra,* at 4.

activity which generates the employment must take place inside the state." Although the absence of this limitation would be noteworthy, its presence hardly is; for it simply prevents Alaska Hire from having what would be the surprising effect of requiring potentially covered out-of-state employers to discriminate against residents of their own State in favor of nonresident Alaskans. In sum, the Act is an attempt to force virtually all businesses that benefit in some way from the economic ripple effect of Alaska's decision to develop its oil and gas resources to bias their employment practices in favor of the State's residents. We believe that Alaska's ownership of the oil and gas that is the subject matter of Alaska Hire simply constitutes insufficient justification for the pervasive discrimination against nonresidents that the Act mandates.[15]

Although appellants raise no Commerce Clause challenge to the Act, the mutually reinforcing relationship between the Privileges and Immunities Clause of Art. IV, § 2, and the Commerce Clause—a relationship that stems from their common

---

[15] *Heim* v. *McCall*, 239 U. S. 175 (1915) and *Crane* v. *New York*, 239 U. S. 195 (1915)—if they have any remaining vitality, see *Sugarman* v. *Dougall*, 413 U. S. 634, 643–645 (1973); *C. D. R. Enterprises, Ltd.* v. *Board of Education*, 412 F. Supp. 1164 (EDNY 1976), summarily aff'd *sub nom. Lefkowitz* v. *C. D. R. Enterprises, Ltd.*, 429 U. S. 1031 (1977)— do not suggest otherwise. In those cases, a New York statute that limited employment "in the construction of public works" to United States citizens and also required that an employment preference be given to New York citizens in such projects was upheld against challenges under both the Constitution and the Treaty of 1871 with Italy. Although the Art. IV, § 2, Privileges and Immunities Clause, along with the Due Process, Equal Protection, and Privileges and Immunities Clauses of the Fourteenth Amendment, was listed as one of the constitutional bases for attacking the statute, no out-of-state United States citizen challenged the law. As a consequence, both the appellants and the Court were concerned almost exclusively with the statute's discrimination against resident aliens. This was reflected in the Court's holding, which was limited to the Fourteenth Amendment and Treaty challenges and expressed no view on appellants' passing Art. IV, § 2, privileges and immunities claim.

origin in the Fourth Article of the Articles of Confederation [16] and their shared vision of federalism, see *Baldwin* v. *Montana Fish and Game Comm'n*, 436 U. S., at 379–380—renders several Commerce Clause decisions appropriate support for our conclusion. *West* v. *Kansas Natural Gas*, 221 U. S. 229 (1911), struck down an Oklahoma statutory scheme that completely prohibited the out-of-state shipment of natural gas found within the State. The Court reasoned that if a State could so prefer its own economic well-being to that of the Nation as a whole, "Pennsylvania might keep its coal, the Northwest its timber, [and] the mining States their minerals," so that "embargo may be retaliated by embargo" with the result that "commerce [would] be halted at state lines." *Id.,* at 255. *West* was held to be controlling in *Pennsylvania* v. *West Virginia*, 262 U. S. 553 (1923), where a West Virginia statute that effectively required natural gas companies within the State to satisfy all fuel needs of West Virginia residents before transporting any natural gas out of the State was held to violate the Commerce Clause. *West* and *Pennsylvania* v. *West Virginia* thus established that the location in a given State of a resource bound for interstate commerce is an insufficient basis for preserving the benefits of the resource exclusively or even

---

[16] That Article provided: "The better to secure and perpetuate mutual friendship and intercourse among the people of the different states in this union, the free inhabitants of each of these states, paupers, vagabonds and fugitives from justice excepted, shall be entitled to all privileges and immunities of free citizens in the several states; and the people of each State shall have free ingress and regress to and from any other State, and shall enjoy therein all the privileges of trade and commerce, subject to the same duties, impositions, and restrictions, as the inhabitants thereof respectively; provided, that such restrictions shall not extend so far as to prevent the removal of property, imported into any State, to any other State of which the owner is an inhabitant; provided, also that no imposition, duties or restriction, shall be laid by any State on the property of the United States, or either of them." 9 Journal of the Continental Congress 908–909 (1777) (Library of Congress ed., 1907).

principally for that State's residents. *Foster Packing Co.* v. *Haydel*, 278 U. S. 1 (1928), went one step further; it limited the extent to which a State's purported *ownership* of certain resources could serve as a justification for the State's economic discrimination in favor of residents. There, in the face of Louisiana's claim that the State owned all shrimp within state waters, the Court invalidated a Louisiana law that required the local processing of shrimp taken from Louisiana marshes as a prerequisite to their out-of-state shipment. The Court observed that "by permitting its shrimp to be taken and all the products thereof to be shipped and sold in interstate commerce, the State necessarily releases its hold and, as to the shrimp so taken, definitely terminates its control." *Id.*, at 13.

*West, Pennsylvania* v. *West Virginia*, and *Foster Packing* thus establish that the Commerce Clause circumscribes a State's ability to prefer its own citizens in the utilization of natural resources found within its borders, but destined for interstate commerce. Like Louisiana's shrimp in *Foster Packing*, Alaska's oil and gas here are bound for out-of-state consumption. Indeed, the construction of the Trans-Alaska Pipeline, on which project appellants' nonresidency has prevented them from working, was undertaken expressly to accomplish this end.[17] Although the fact that a state-owned resource is destined for interstate commerce does not, of itself, disable the State from preferring its own citizens in the utilization of that resource, it does inform analysis under the Privileges and Immunities Clause as to the permissibility of the discrimination the State visits upon nonresidents based on its ownership of the resource. Here, the oil and gas upon

---

[17] In authorizing the construction of the Trans-Alaska Pipeline, Congress expressly found that "[t]he early development and delivery of oil and gas from Alaska's North Slope *to domestic markets* is in the national interest because of growing domestic shortages and increasing dependence upon insecure foreign sources." 43 U. S. C. § 1651 (a) (1970 ed., Supp. V) (emphasis added).

which Alaska hinges its discrimination against nonresidents are of profound national importance.[18] On the other hand, the breadth of the discrimination mandated by Alaska Hire goes far beyond the degree of resident bias Alaska's ownership of the oil and gas can justifiably support. The confluence of these realities points to but one conclusion: Alaska Hire cannot withstand constitutional scrutiny. As Mr. Justice Cardozo observed in *Baldwin* v. *G. A. F. Seelig, Inc.,* 294 U. S. 511, 523 (1935), the Constitution "was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division."[19]

*Reversed.*

---

[18] In enacting the Alaska Natural Gas Transportation Act of 1976, 15 U. S. C. § 719 *et seq.* (1976 ed.) Congress declared:

"(1) a natural gas supply shortage exists in the contiguous States of the United States;

"(2) large reserves of natural gas in the State of Alaska could help significantly to alleviate this supply shortage;

"(3) the expeditious construction of a viable natural gas transportation system for delivery of Alaska natural gas to United States markets is in the national interest; and

"(4) the determinations whether to authorize a transportation system for delivery of Alaska natural gas to the contiguous States and, if so, which system to select, involve questions of the utmost importance respecting national energy policy, international relations, national security, and economic and environmental impact, and therefore should appropriately be addressed by the Congress and the President in addition to those Federal officers and agencies assigned functions under law pertaining to the selection, construction, and initial operation of such a system." 15 U. S. C. § 719 (1976 ed.). See n. 17, *supra.*

[19] In light of our conclusion that Alaska Hire is invalid under the Privileges and Immunities Clause of Art. IV, § 2, we have no occasion to address appellants' challenges to the Act under the Equal Protection Clause of the Fourteenth Amendment.