OPINION OF THE COURT
Chief Judge Cooke.
Appellant, a resident of North Carolina, mounts this challenge to the constitutionality of CPLR 9406 (subd 2). That rule provides that a person may not be admitted as a member of the Bar of this State unless he furnishes proof "that he has been an actual resident of the state of New York for six months immediately preceding the submission of his application for admission to practice”.[1] Among other infirmities, it is claimed that the rule is violative of the privileges and immunities clause of article IV of the Federal Constitution.[2] We agree with that contention.
A graduate of the University of Virginia Law School and member of the Bars of Virginia and North Carolina, appellant was employed as in-house counsel to Western Electric Company in New York City. After working in New York for over two years, appellant qualified for, took and passed the New York State Bar Examination in July, 1977.[3] Before he was notified of the results of the examination, however, appellant *270 was unexpectedly transferred to North Carolina by his employer, where he presently resides.
Apparently under the dual impression that his prior New York residence qualified him for admission to the Bar[4] and that, by virtue of his employment, he was engaged in the practice of law in New York, appellant filed an application for admission to practice with the Committee on Character and Fitness of the First Department (Judiciary Law, § 90, subd 1; CPLR 9402; 22 NYCRR 520.9).[5] In view of appellant’s North Carolina residence, the committee deferred action on his application. Appellant thereupon challenged the residency requirement by petitioning the Appellate Division for admission without certification of the Committee on Character and Fitness (CPLR 9404). The Appellate Division denied the application, holding CPLR 9406 (subd 2) constitutional (67 AD2d 215). Although appellant relies upon a number of constitutional provisions in support of his claim that the residence requirement for admission to the Bar is unconstitutional,[6] it is necessary only to address the claim that the rule denies nonresidents the same privileges and immunities accorded residents.
The principal purpose of the privileges and immunities clause, like the commerce clause,[7] is to eliminate protectionist burdens placed upon individuals engaged in trade or com *271 merce by confining the power of a State to apply its laws exclusively to nonresidents (Paul v Virginia, 8 Wall [75 US] 168, 180; Tribe, American Constitutional Law, § 6-32, p 406). In essence, the clause prevents a State from discriminating against nonresidents merely to further its own parochial interests or those of its residents[8] (Hicklin v Orbeck, 437 US 518; Mullaney v Anderson, 342 US 415; Toomer v Witsell, 334 US 385). While the precise reach of the clause must await further clarification, it is settled that a State may not premise an individual’s right to engage in his chosen occupation within its borders solely on residence. Thus, the clause has been consistently interpreted to prevent a State from imposing discriminatory burdens on nonresidents, whether by means of artificial trade barriers in the form of unequal licensing fees (Toomer v Witsell, supra), taxes imposed on out-of-State vendors (Ward v Maryland, 12 Wall [79 US] 418), or employment preferences granted only to residents (Hicklin v Orbeck, supra).
This is not to say, of course, that the privileges and immunities clause forbids a State from ever differentiating between residents and nonresidents. Matters which directly implicate its sovereignty, such as voting (Dunn v Blumstein, 405 US 330) or entitlement to public office (Chimento v Stark, 414 US 802), furnish ready examples of areas in which a State may constitutionally condition eligibility upon residence. Moreover, where the disparate treatment does not implicate "those 'privileges’ and 'immunities’ bearing upon the vitality of the Nation as a single entity”, there is no requirement that the State treat resident and nonresident alike[9] (Baldwin v Mon *272 tana Fish & Game Comm., 436 US 371, 383). But those areas exempt from privileges and immunities protection are narrow and do not embrace the grant of a license to practice law.
No extended discussion is necessary to demonstrate that the right to pursue one’s chosen occupation free from discriminatory interference is the very essence of the personal freedom that the privileges and immunities clause was intended to secure (Hicklin v Orbeck, 437 US 518, 524-525, supra; Ward v Maryland, 12 Wall [79 US] 418, 430, supra). It is now beyond dispute that the practice of law, despite its historical antecedents as a learned profession somehow above that of the common trades, is but a species of those commercial activities within the ambit of the clause (cf. Bates v State Bar of Ariz., 433 US 350, 371-372; Goldfarb v Virginia State Bar, 421 US 773, 788). From the standpoint of both the public and the legal profession itself, the practice of law is analogous to any other occupation in which an independent agent acts on behalf of a principal.
Nor can it be maintained that CPLR 9406 (subd 2) works no invidious discrimination against nonresidents. An attorney admitted to practice in one State who desires to practice in New York must often give up an established practice and residence, move to New York and forfeit the right to engage in his or her chosen occupation for at least six months and often appreciably longer. One who desires to engage in a multistate practice, concentrating on a particular area of expertise, is effectively foreclosed from doing so by the requirements of CPLR 9406 (subd 2). Those attorneys now employed by large corporations, currently comprising more than 10% of the legal profession (Yovovich, The Tense Marriage Between Business and Lawyers, Barrister, Spring 1979, p 43), whose duties entail frequent interstate relocation are similarly penalized by the operation of the rule.[10] The dispar *273 ity of treatment between residents of the State and nonresidents is manifest: given two equally qualified candidates who have passed the Bar examination (or, for that matter, meet the other requirements for admission on motion) and possess the requisite character and fitness, the rule would deny one admission based solely upon residence.
Where the State imposes a wide-ranging restriction which significantly impairs the efforts of nonresidents to earn a livelihood, the discriminatory action must surmount two distinct hurdles. First the governmental interest claimed to justify the discrimination must be carefully examined to determine whether that interest is substantial, that is, whether "non-citizens constitute a peculiar source of the evil at which the statute is aimed” (Toomer v Witsell 334 US 385, 398, supra). Assuming that nonresidents do indeed present a problem with which the State may legitimately address, the inquiry then focuses upon whether the means adopted to achieve that goal are narrowly drawn and are the least restrictive alternatives available (Hicklin v Orbeck, 437 US 518, 528, supra).
It is undisputed that New York has a constitutionally permissible interest to assure that those admitted to the Bar possess knowledge of the law as well as the character and fitness requisite for an attorney (Judiciary Law, § 90; Law Students Research Council v Wadmond, 401 US 154, 159; Schware v Board of Bar Examiners, 353 US 232, 239). But appellant has not been excluded from membership in the Bar due to any challenge to his knowledge of the law of this State or to his good character. Rather, the exclusion is based solely upon his residence in North Carolina — a criterion which serves no purpose other than to deny persons the right to pursue their professional career objectives because of parochial interests.
There is nothing in the record to indicate that an influx of nonresident practitioners would create, or even threaten to create, a particular evil [within the competence of the State] to address. No valid reason is proffered as to why admission to practice law before the courts of this State must be made dependent upon residency. Indeed, aside from an oblique *274 reference to the purported "dangers” said to be inherent in the licensing of nonresident lawyers, the State is at a complete loss to justify the blanket discrimination against nonresidents arising from the operation of CPLR 9406 (subd 2). Nevertheless, some have attempted to identify reasons supporting residency requirements for admission to the Bar (see Note, 92 Harv L Rev 1461, 1480). On the whole, however, these justifications serve only administrative convenience and thus are not closely tailored to serve a legitimate State interest (cf. Sosna v Iowa, 419 US 393, 406).
The rationale most often used to uphold residency requirements is the need of Bar admission authorities to observe and evaluate the applicant’s character (cf., e.g., Lipman v Van Zant, 329 F Supp 391, 402; Webster v Wofford, 321 F Supp 1259, 1262; Note, 71 Mich L Rev 838, 850-852). But in this State, the applicant himself, in submitting his application for admission, is available to the Committee on Character and Fitness and is personally interviewed by one of its members. In some cases, nonresidents are permitted to furnish affidavits attesting to the applicant’s character and fitness to practice law. Nor may the discrimination visited upon nonresidents be justified upon the ground that only resident attorneys will be amenable to the supervision of our courts (67 AD2d 215, 217; Matter of Tang, 39 AD2d 357, 360, app dsmd 35 NY2d 851). To be sure, the State has a legitimate interest in controlling the attorneys who appear in its courts. Again, however, there are alternatives which are less restrictive than denial of admission to practice which would further this interest. For example, nothing prevents the State from enacting legislation requiring nonresident attorneys to appoint an agent for the service of process within the State (cf. Hess v Pawloski, 274 US 352; Doherty & Co. v Goodman, 294 US 623). Moreover, remedies currently available to safeguard against abuses by resident attorneys — contempt, disciplinary proceedings and malpractice actions — could be applied with equal force against miscreant nonresident attorneys.
That the State has an obligation to ensure the competency and rectitude of its counselor at law is a proposition with which none may quarrel (Matter of Griffiths, 413 US 717). This obligation, however, may not be fulfilled at the expense of constitutionally protected rights (see Konigsberg v State Bar, 366 US 36). By denying otherwise qualified applicants their right to practice their chosen occupation based solely on *275 their State of residence, CPLR 9406 (subd 2) works an unconstitutional discrimination against nonresidents. Any interest the State may have in regulating nonresident attorneys is ill served by the onerous burden imposed by the rule. A number of less drastic, and constitutionally permissible, alternatives are readily available to protect the interest of the State in supervising those who practice in its courts (see, e.g., Note, 92 Harv L Rev 1461, 1487-1489).
Accordingly, the order of the Appellate Division should be reversed, without costs, and the matter remitted to the Appellate Division, First Department, for further proceedings on petitioner’s application for admission to the Bar.
Judges Jasen, Gabrieuj, Jones, Wachtler, Fuchsberg and Meyer concur.
Order reversed, without costs, and matter remitted to the Appellate Division, First Department, for further proceedings in accordance with the opinion herein.

. In addition to those who are actual residents of New York, section 464 of the Judiciary Law provides that a person otherwise eligible for certification by the Board of Law Examiners for admission to the Bar shall be considered to be an actual resident and citizen of the State during any period of time in which he is employed full time within the State of New York.

. "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States” (US Const, art IV, § 2, cl 1).

. At the time this controversy arose, eligibility to take the Bar examination, like eligibility for admission to Bar, was premised, at least in part, upon the residency of the applicant (22 NYCRR 520.2 [a] [3]).

. Actually, appellant was required to satisfy two six-month durational residency requirements: one to take the Bar examination (22 NYCRR 520.2 [a] [3]; the other to satisfy the admission requirements of CPLR 9406 (subd 2).

. In addition to meeting two durational residency requirements (n 4, supra), three other conditions must be satisfied. Unless waived, the applicant must pass an examination conducted, semiannually, by the State Board of Law Examiners. Second, the applicant must possess the requisite character and fitness consistent with that required of an attorney. To assist in this evaluation, the applicant must furnish the Committee on Character and Fitness with affidavits attesting to his good moral character, fill out a detailed questionnaire and undergo a personal interview with a committee member. Finally, the applicant must swear that he will support the Federal and State Constitutions (see, generally, Law Students Research Council v Wadmond, 401 US 154, 156-157).

. It is asserted that CPLR 9406 (subd 2) denies appellant equal protection and due process of law (US Const, 14th Amdt). Although unnecessary to pass upon these claims, we note that similar challenges to six-month durational residency requirements have been rejected in the past (Matter of Tang, 39 AD2d 357, app dsmd 35 NY2d 851; Tang v Appellate Div. of N. Y. Supreme Ct., First Dept., 373 F Supp 800, affd 487 F2d 138, cert den 416 US 906; Wilson v Wilson, 416 F Supp 984, affd 430 US 925; Suffling v Bondurant, 339 F Supp 257, affd sub nom. Rose v Bondurant, 409 US 1020).

. Many have recognized the "mutually reinforcing relationship” between the privileges and immunities and the commerce clauses (Hicklin v Orbeck, 437 US 518, *271 531, supra; Toomer v Witsell, 334 US 385, 407-409 [Frankfurter, J., concurring], supra; Tribe, American Constitutional Law, § 6-32, at p 404). The manifest distinction between the two is that the privileges and immunities clause is an affirmative grant of rights to individuals whereas the commerce clause has been read to limit the power of the individual States to restrict the free flow of goods and services across State lines (see Philadelphia v New Jersey, 437 US 617, 621-622).

. At one time, the privileges and immunities clause was thought to recognize what, within the philosphical terminology of the day, were termed "natural rights” (see Corfield v Coryell, 6 Fed Cas 546 [No. 3230]). Under this earlier theory, the purpose of the clause was to guarantee every citizen a group of fundamental rights which no State could transgress (see Calder v Bull, 3 Dallas [3 US] 386, 388). With the passage of time, however, it has become settled that the clause does not import that a citizen carries with him a set of well-defined privileges and immunities no matter where he may travel. Rather, the clause is meant "to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy” (Toomer v Witsell, 334 US 385, 395, supra).

. As noted, the breadth of the privileges and immunities clause is presently *272 unclear. In any event, there are certain rights deemed fundamental for privileges and immunities purposes which severely limit the power of the State to discriminate against nonresidents. In addition to the right to engage in one’s chosen occupation, these fundamental rights include the right to own and alienate property within the State (Blake v McClung, 172 US 239), the right to equal treatment in the courts (Canadian Northern Ry. Co. v Eggen, 252 US 553) and the right to seek services available in the State (Doe v Bolton, 410 US 179). A nonresident wishing to exercise at least these rights in a foreign State is entitled to the same privileges and immunities a resident of that State receives.

. These considerations, together with an often unstated feeling that durational residency requirements constitute protectionist trade barriers for the economic protec *273 tion of local interests, have given rise to numerous calls to nationalize admission to the Bar (e.g., Smith, Time for a National Practice of Law Act, 64 ABAJ 557; Brakel & Loh, Regulating the Multistate Practice of Law, 50 Wash L Rev 699; Note, 56 Cornell L Rev 831).