Ronald J. TROYER, Daniel Stein, and Linda Christensen, Plaintiffs,

v.

TOWN OF BABYLON, Town of Huntington, Town of Riverhead, Town of Southampton, Defendants.

No. 79–C–401.

United States District Court, E. D. New York.

Jan. 4, 1980.

Levy, Gutman, Goldberg & Kaplan, New York City, for plaintiffs; Jeremiah S. Gutman, Donna Glasgow, New York City, of counsel.

Smith, Finkelstein, Lundberg, Crimmins & Yakaboski, Robert C. Crimmins, Riverhead, N.Y., for defendant Town of Southampton.

**1136**

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

Fifteen years ago defendant, the Town of Southampton, adopted an ordinance designed to (1) reduce solicitors' leaving of printed materials which target empty houses for would-be burglars and create problems of litter; and (2) protect its inhabitants' privacy and its tourist population against victimization by solicitors. Plaintiffs are members and missionaries of the Holy Sprit Association for the Unification of World Christianity. To aid their evangelical activities Church members solicit support both in the streets and other areas where people congregate, and door-to-door, tendering literature, flowers and other merchandise for cash offerings. They seek an order enjoining enforcement of the ordinance and declaring it unconstitutional as applied to them on the grounds that it abridges their exercise of freedom of speech and religion and deprives them of the equal protection of the law.

Southampton has 45,756 inhabitants who occupy 145 square miles, making its density one person per two acres. The population multiplies in the summer months to accommodate vacationers; much of the year many homes are vacant and substantial neighborhoods are virtually unattended.

Founded in 1640, the town is successor to the first English settlement in New York. A group from Lynn, Massachusetts sought good farm land, religious freedom and privacy on the east end of Long Island. *See generally* Robertson, Purcell B., Profiles of the Early Settlers of the Town of Southampton, Long Island (1977); Adams, James Truslow, History of the Town of Southampton (1918); Pelletreau, William S., Old Southampton, The Long Island Magazine, Vol. 1, No. 2, p. 22 (Sept. 1893); Howell, George Rogers, History of Southampton with Genealogies (2d ed. 1887).

Poor roads kept Southampton fairly isolated and the town's people closely knit. "One of the most fundamental aspects [of life in Southampton] was the screening of all prospective newcomers with the right of acceptance (usually preceded by a trial period of six months) or rejection." Robertson, Purcell B., Profiles of the Early Settlers of the Town of Southampton, Long Island, 9 (1977); I Southampton Town Records, p. 111 (1965). Town approval had to be acquired before a house or property could be sold. Adams, James Truslow, History of the Town of Southampton, 98–99 (1918). In the case of transients, bonds were required from their hosts. *Id.* at 98; II Southampton Town Records, p. 181 (1691).

At the trial of this action the town's people's continuing strong sense of privacy was stressed. Somewhat facetious repeated references during the trial to witnesses who had not been born in the town but had lived there for "only" decades suggested a widespread suspicion of strangers.

### I. ORDINANCE

The Southampton ordinance prohibits door-to-door distribution of religious literature and the solicitation of funds without the prior consent of the occupants, but exempts from its operation any person who has resided or maintained a place of business in the town for at least six months. It reads as follows:

Ordinance No. 43

Solicitors on Private Property

No person shall enter upon any private residential property in the Town of Southampton, Suffolk County, New York, for the purpose of vending, peddling, or soliciting orders for any merchandise, device, book, periodical or printed matter whatsoever; nor for the purpose of soliciting alms, or a subscription or a contribution to any church, charitable or public institution whatsoever; nor for the purpose of distributing any handbill, pamphlet, tract, notice or advertising matter, nor for the purpose of selling or distributing any ticket or chance whatsoever, without the consent of the occupant of said premises previously given.

Nothing herein contained shall be construed to apply to any person who has been a bona fide resident of the Town of Southampton, New York, for a period of

at least six (6) consecutive months last past, nor to any person who has maintained a place of business in the Town of Southampton for a period of at least six (6) consecutive months, prior thereto, or his duly authorized representative. Any person violating this Ordinance shall be subject to a penalty of not more than One Hundred ($100.00) Dollars for each violation thereof.

Any violation of this Ordinance shall constitute disorderly conduct, and the person violating the same shall be a disorderly person.

## II. LAW

Defendant's concern for its residents' privacy and the protection of their property, privacy and aesthetic enjoyment of the area is entitled to consideration. So, too, are plaintiffs' constitutional rights of free speech and religion and the rights of those in the town to receive plaintiffs' information.

The Church is controversial and some of its public activities have been said to have a higher content of the secular—e. g., selling flowers, candy and other objects for cash—than is usual in most organized religions today. *See, e. g.,* F. Sontag, Sun Myung Moon and the Unification Church (1977); I. L. Horowitz, Science, Sin and Scholarship (1978); C. Edwards, Crazy for God, 156–170 (1979); A. Nelson, God, Man and the Rev. Moon, The Nation, p. 325, March 31, 1979; C. Trillin, Bayou La Batre, Alabama, New Yorker, p. 99, March 27, 1978. Yet there is little doubt that its canvassing activities must be characterized as religious for purposes of the first amendment. There is a "reasonable possibility (1) that the conviction [of plaintiffs] is sincerely held and (2) that [their beliefs are] based upon what can be characterized as theological, rather than secular—e. g., purely social, political or moral views." *Stevens v. Berger,* 428 F.Supp. 896, 899 (E.D.N.Y.1977). *See also, e. g.,* Note, "Mind Control" or Intensity of Faith: The Constitutional Protection of Religious Belief, 13 Harv. Civil Rights—Civil Liberties L.Rev. 751 (1978).

Where there is a conflict between rights, our pragmatic society usually attempts to preserve as much of the interests of all parties as possible. We recognize that the extension of the freedoms of some often has a tendency to encroach upon those claimed by others. Nevertheless, the burdens placed on plaintiffs' free expression of ideas are not easily justified by balancing them against local interests in privacy and property. *See, e. g.,* Tribe, American Constitutional Law §§ 12–2 et seq. (1978); Frantz, The First Amendment in the Balance, 71 Yale L.J. 1424 (1962). Here the issue is whether the town has drawn a proper constitutional balance by preferring residents' religious proselytizing over that of strangers, and by requiring outsiders to restrict their activities to public business areas or to obtain permission *before* approaching private homes.

A. *Burdens Imposed By Town Ordinance*

1. Burdens Imposed by Limiting Non-Commercial Solicitation

Enforcement of Ordinance 43, prohibiting all distribution of literature to homes except upon compliance with burdensome conditions, adversely affects plaintiffs' ability to disseminate information that is within the protection of the first amendment. In *Martin v. City of Struthers,* 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943), the Supreme Court balanced the interests of a city against the limitations imposed upon freedom of speech by a flat prohibition of door-to-door solicitation and found it unconstitutional.

The right of freedom of speech and press has broad scope. The authors of the First Amendment knew that novel and unconventional ideas might disturb the complacent, but they chose to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance.

319 U.S. at 143, 63 S.Ct. at 863. There, as here, the municipality claimed a unique interest in preventing harassment, litter, fraud and burglary. There, as here, the

statute was applied to one espousing a religious cause. The Court, despite these claims, found the state's intervention unjustified.

> While door-to-door distributers of literature may be either a nuisance or a blind for criminal activities, they may also be useful members of society engaged in the dissemination of ideas in accordance with the best tradition of free discussion. The widespread use of this method of communication by many groups espousing various causes attests its major importance. . . . Many of our most widely established religious organizations have used this method of disseminating their doctrines . . . . Door-to-door distribution of circulars is essential to the poorly financed causes of little people. . . . The dangers of distribution can so easily be controlled by traditional legal methods, leaving to each householder the full right to decide whether he will receive strangers as visitors, that stringent prohibition can serve no purpose but that forbidden by the Constitution, the naked restriction of the dissemination of ideas.

319 U.S. at 145–147, 63 S.Ct. at 864–65. *See also Lovell v. Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938); *Hynes v. Mayor of Oradell,* 425 U.S. 610, 623–630, 96 S.Ct. 1755, 1762–1765, 48 L.Ed.2d 243 (1976) (Brennan, J., concurring). Following *Martin,* courts have invalidated local ordinances in circumstances similar to the one at bar. *See Weissman v. City of Alamogordo, N.M.,* 472 F.Supp. 425 (D.C.N.M.1979) (local ordinance prohibiting church activities declared invalid); *Love v. Mayor, City of Cheyenne, Wyo.,* 448 F.Supp. 128 (D.C.Wyo.1978) (same).

### 2. Burdens Imposed by Requiring Invitation to Solicit

The problem not addressed by *Martin v. City of Struthers*—to what extent the state, or a subdivision, may adopt regulations concerning the exercise of individual homeowner consent—may be answered by a synthesis of *Lamont v. Postmaster General,* 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) and *Rowan v. United States Post Office,* 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970). In *Lamont,* the Court invalidated a statute which, in effect, required the citizens to indicate a desire to receive "communist propaganda" from abroad. The statute was found unconstitutional because it imposed an affirmative obligation of consent to receive communications.

In *Rowan,* the Court sustained a procedure permitting a citizen to elect not to receive certain mail; it recognized the tradition of permitting individuals to shield themselves, at least at home, from unwanted intrusions. "The Court has traditionally respected the right of a householder to bar, by order or notice, solicitors, hawkers or peddlers from his property." 397 U.S. at 737, 90 S.Ct. at 1490.

In effect, *Lamont* and *Rowan* read together indicate that in balancing societal and private interests in the free flow of ideas, the right of individual citizens to privacy and the ability of the state to exercise its police power, the Constitution does not allow government to create a rebuttable presumption that people do not wish to be exposed to a particular class of ideas, or mode of expression. To override strong first amendment interests, the individual desiring privacy must assume the burden of indicating the choice to be left alone. The role left to the states is to facilitate individual choice.

New York follows the *Rowan* approach. Its statutes protect residents from unwanted visitors, unscrupulous business operators, high pressure salespersons and potential burglars; they permit the householder or the consumer to take affirmative action by posting to prevent solicitation and by punishing illegal conduct, rather than by requiring an invitation to solicit. New York Penal Law Sections 140.05 and 140.10 make it a violation to enter onto property when posted signs specifically ask solicitors not to do so. *People v. Basch,* 36 N.Y.2d 154, 158–159, 365 N.Y.S.2d 836, 840, 325 N.E.2d 156 (1975); *People v. Acee,* 15 N.Y.2d 568, 254 N.Y.S.2d 833, 203 N.E.2d 298 (1964); App.Div.1966). *See also* N.Y. Personal

Property Law, Art. 10–A Home Solicitation Sales §§ 425 et seq. (affords consumers, subjected to door-to-door sales a "cooling-off" period); N.Y. General Business Law § 396 (prohibits fraudulent sales practices); Executive Law, Art. 7–A (regulates solicitation and collection of funds for charitable purposes). If the Town of Southampton finds it necessary to supplement the State laws with regulations of its own, it must do so in a manner that does not burden the first amendment rights of willing speakers and willing listeners.

### 3. Burdens Imposed by Equivalent of Licensing Fee

Perhaps a group might by a comprehensive telephone campaign arrange for permission before visiting particular homes, but the financial and logistical burdens would inhibit newly organized or minor cults and creeds. Requiring consent of householders before approaching their homes constitutes, in effect, an indirect unconstitutional imposition of a licensing fee; it generates costs which burden the exercise of first amendment rights in direct proportion to the number of persons the speaker wants to reach. *See, e. g., Hynes v. Mayor and Council of Borough of Oradell*, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976) (licensing); *Follett v. Town of McCormick, S.C.*, 321 U.S. 573, 64 S.Ct. 717, 88 L.Ed. 938 (1944) (fees). It does not matter whether the impediment to free speech works its evil overtly or covertly. *Grosjean v. American Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936).

### 4. Burden Imposed By Discriminating Against Outsiders' Ideas

The second part of the Southampton ordinance exempts from the operation of the first part " . . . any person who has been a bona fide resident of the Town of Southampton, New York, for a period of at least six consecutive months last past, [or] any person who has maintained a place of business in the Town of Southampton *for a period of at least six consecutive months* . . . or his duly authorized representative."

Although the ordinance appears to be ideologically neutral, in effect it differentiates on the basis of content by precluding those with "foreign" ideas from availing themselves of an historically protected means of communication while opening the same medium to residents' point of view. Thus, as applied, the ordinance distinguishes between permissible solicitation based upon subject matter, i. e., it prevents persons carrying messages that are not already represented in the town from using a forum that is available to residents. Even a nonresident authorized representative of a resident may solicit; only those with uncongenial beliefs would find it difficult to locate a sponsor.

■ Government has no power to restrict expression or communication because of its content, subject matter or familiarity. *Cohen v. California*, 403 U.S. 15, 24, 91 S.Ct. 1780, 1787, 29 L.Ed.2d 284 (1971). Once the Southampton ordinance is perceived as one which describes permissible door-to-door solicitation in terms of subject matter, it is outlawed by *Police Department of City of Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). In *Mosley*, a Chicago ordinance prohibited all picketing within 150 feet of a school, except peaceful picketing of any school involved in a labor dispute. It was held violative of the equal protection clause of the fourteenth amendment because it made an impermissible distinction based upon content. The Court held:

. . . under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. . . . There is an "equality of status in the field of ideas," and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. . . .

Guided by these principles we have frequently condemned such discrimination among different users of the same medium of expression.

408 U.S. at 96, 92 S.Ct. at 2290.

5. Burdens Imposed by Limiting Freedom of Movement

■ Even if the town's regulation is not characterized as a content censoring device, it remains subject to strict scrutiny under the equal protection clause because it distinguishes between residents and non-residents:

The fourteenth amendment provides:

[N]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

The term person in this context encompasses residents and non-residents and entitles both to equal protection of a state's laws. See Karst, Foreword: Equal Citizenship Under the Fourteenth Amendment, 91 Harv.L.Rev. 1, 4 (1977). An ordinance based upon citizenship, residence or alienage creates a suspect classification and must be shown to be necessary to further a compelling state interest. See, e. g., Sugarman v. Dougall, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973); In Re Griffith, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973). Cf. Perry, Modern Equal Protection: A Conceptualization and Appraisal, 79 Colum.L.Rev. 1023, 1060 ff (1979) (doctrine explicable on federalism rather than equal protection grounds as it applies to aliens).

■ The right to travel freely within this nation to speak, work and enjoy other incidents of life, liberty and property is an aspect of the constitutional right not to be discriminated against because of residence. It is essential to the fundamental concept of a free society operating in a single nation and thus serves as one of the pillars of our constitutional structure. Cf. C. Black, Structure and Relationships in Constitutional Law (1969). Laws that prohibit newly arrived persons in a state or county from receiving the same benefits as established residents unconstitutionally burden the right to travel. See, e. g., Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Memorial Hospital v. Maricopa County, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974). In Memorial Hospital, the Court noted:

Not unlike the admonition of the Bible that, "Ye shall have one manner of law, as well for the stranger, as for one of your own country," Leviticus 24:22 (King James Version), the right of interstate travel must be seen as insuring new residents the same right to vital government benefits and privileges in the States to which they migrate as are enjoyed by other residents.

415 U.S. at 261, 94 S.Ct. at 1084.

Defendants rely heavily on the fact that New York's highest court, thirty years ago, approved an ordinance discriminating against nonresident solicitors on the ground that "the distinction is valid in a small village where, presumably, the dangers and annoyances of trespasses or unsolicited visits are less when the trespassers or uninvited visitors are not strangers but known, or easily identifiable and traceable, residents of the community." People v. Bohnke, 287 N.Y. 154, 159, 38 N.E.2d 478, 479 (1941), cert. denied, 316 U.S. 667, 62 S.Ct. 1034, 86 L.Ed. 1743 (1942). But constitutional doctrine has changed and so has the attitude of the New York Court of Appeals. It has recently stricken its six month residence requirement for bar candidates as a violation of the privileges and immunities clause embodied in Article IV of the federal Constitution. In re Gordon, 48 N.Y.2d 266, 422 N.Y.S.2d 641, 397 N.E.2d 1309 (1979). In view of the forthright unanimous decision in Gordon and supporting authority, it seems likely that the New York Court of Appeals would have declared that Southampton ordinance invalid as an "invidious discrimination against nonresidents." 48 N.Y.2d at 272, 422 N.Y.S.2d 641. This appears to have been the conclusion of the Supreme Court, which distinguished Bohnke on the ground that it "was decided before this Court's decision in Martin v.

*City of Struthers." Breard v. City of Alexandria, La.,* 341 U.S. 622, 628, n. 6, 71 S.Ct. 920, 925, n. 6, 95 L.Ed. 1233 n. 6 (1951). *People v. Bohnke* is no longer binding.

### 6. Burdens Imposed By Need to Comply with Differing Local Regulations

In addition to portions of New York City, there are in the Eastern District of New York the counties of Nassau and Suffolk, 92 villages, 13 towns and 2 cities, each having power to enact local ordinances. Were each of these municipalities to adopt a separate provision regulating the flow of ideas, organizations such as the Church would be seriously burdened in attempts to solicit and proselytize in this district. Even if each ordinance presented a relatively minor barrier, the necessity of complying with different regulations in each of over 100 separate municipalities would effect a substantial barrier to the free transmittal of views across all of Long Island. The open marketplace of ideas cannot be restricted to little stalls, each separately regulated by local officials.

That this threat to free speech and unencumbered exercise of religion is a real one is reflected in the history of this lawsuit. In its original posture it involved different ordinances of eight other towns and villages located throughout Long Island. The defendants included the Towns of Babylon, Huntington, Riverhead, Hempstead and Oyster Bay and the Villages of Hempstead, Freeport and Rockville Centre. Seven settled with plaintiffs and a judgment was entered, after a trial, declaring Babylon's ordinance unconstitutional as applied to plaintiffs.

### B. *Lack of Compelling Local Interest*

■ Ordinances imposing restrictions on the ability to exercise fundamental rights are unconstitutional unless the state can demonstrate that they are "necessary to promote a compelling government interest." *Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969). The Town of Southampton has a heavy burden of justification.

During the trial a number of persons testified that the Town's homeowners prefer not to have persons coming to their houses and intruding upon their privacy. The witnesses indicated that, even today, a long time next-door neighbor will not visit except upon specific invitation by telephone or face-to-face arrangement made off the property. The town is also concerned that the posting of numerous signs will have an adverse effect on the aesthetics of this rural community and cause property values to decline because potential purchasers will suspect that something is amiss. Southampton's police chief testified that it takes about six months to recognize new residents and that the ordinance facilitates patrol of the area since any stranger may be stopped and at least warned that door-to-door canvassing is forbidden by a local ordinance.

Such justifications are inadequate.

It is not sufficient for the State to show that durational residence requirements [and classifications based upon residence or the content of speech] further a very substantial state interest. In pursuing that important interest, the State cannot choose means that unnecessarily burden or restrict constitutionally protected activity. Statutes affecting constitutional rights must be drawn with "precision," *NAACP v. Button,* 371 U.S. 415, 438 [83 S.Ct. 328, 9 L.Ed.2d 405] (1963); *United States v. Robel,* 389 U.S. 258, 265 [88 S.Ct. 419, 19 L.Ed.2d 508] (1967), and must be "tailored" to serve their legitimate objectives. *Shapiro v. Thompson, supra,* [394 U.S.] at 631 [89 S.Ct. 1322]. And if there are other, reasonable ways to achieve these goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose "less drastic means." *Shelton v. Tucker,* 364 U.S. 479, 488 [81 S.Ct. 247, 5 L.Ed.2d 231] (1960).

*Dunn v. Blumstein,* 405 U.S. 330, 343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1971). *See also Talley v. California,* 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960).

If the town's concern is for the privacy of its residents, it may advise each of them that unwanted intrusions may be avoided by the posting of signs that warn off solicitors. Here the dangers of distribution may " . . . easily be controlled by traditional legal methods, leaving to each householder the full right to decide whether he will receive strangers as visitors." *Martin v. City of Struthers,* 319 U.S. 141, 147, 63 S.Ct. 862, 865, 87 L.Ed. 1313 (1943). *See also, e. g., Hynes v. Mayor and Council of Borough of Oradell,* 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *Frontiero v. Richardson,* 411 U.S. 677, 690–91, 93 S.Ct. 1764, 1773, 36 L.Ed.2d 583 (1973); *Reed v. Reed,* 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971) (economy and administrative convenience cannot justify a statutory classification that is subject to strict judicial scrutiny). Evidence that signs posted by individual owners might reduce property values is entitled to little weight when measured against the burdens on constitutionally protected rights of the plaintiff Church solicitors.

### III. CONCLUSION

The interests of the Town of Southampton in the privacy of its citizens, the reduction of litter and the maintenance of property values are not sufficient to justify the burdens imposed upon plaintiffs' constitutional rights by Ordinance 43. It is declared unconstitutional as applied to plaintiffs.

So ordered.