11-4283-cv
Schoenefeld v. Schneiderman

# In the
# United States Court of Appeals
## For the Second Circuit

_____

August Term, 2014

(Argued: June 4, 2015      Decided: April 22, 2016)

Docket No. 11-4283-cv
_____

EKATERINA SCHOENEFELD,

*Plaintiff-Appellee,*

—v.—

ERIC T. SCHNEIDERMAN, in his official capacity as Attorney General of the State of New York; ALL JUSTICES OF NEW YORK SUPREME COURT, APPELLATE DIVISION, THIRD JUDICIAL DEPARTMENT; ROBERT D. MAYBERGER, in his official capacity as Clerk of New York Supreme Court, Appellate Division, Third Judicial Department; JOHN G. RUSK, Chairman of the Committee on Professional Standards ("COPS"),

*Defendants-Appellants,*

STATE OF NEW YORK; NEW YORK SUPREME COURT, APPELLATE DIVISION, THIRD JUDICIAL DEPARTMENT; COMMITTEE ON PROFESSIONAL STANDARDS OF NEW YORK SUPREME COURT, APPELLATE DIVISION, THIRD JUDICIAL DEPARTMENT AND ITS MEMBERS,

*Defendants.*
_____

Before:

RAGGI, HALL, CARNEY, *Circuit Judges.*
_____

Appeal from a judgment of the United States District Court for the Northern District of New York (Kahn, *J.*) declaring unconstitutional, under the Privileges and Immunities Clause, a New York law requiring nonresident attorneys to maintain an "office for the transaction of law business" within New York State in order to practice law in that state's courts. N.Y. Judiciary Law § 470; <u>see</u> U.S. Const. art. IV, § 2. In response to a certified question from this court, the New York Court of Appeals has clarified that § 470 cannot be satisfied by anything less than a physical office, a decision that does not allow us to avoid deciding plaintiff's constitutional challenge. We here conclude that § 470 does not violate the Privileges and Immunities Clause because it was enacted not for a protectionist purpose to favor New York resident attorneys but, rather, to provide a means whereby nonresidents could establish a physical presence in the state akin to that of residents, thereby resolving a service concern while allowing nonresidents to practice law in the state's courts.

REVERSED AND REMANDED.

Judge HALL dissents in a separate opinion.

―――――――――

> EKATERINA SCHOENEFELD, Schoenefeld Law Firm LLC, Princeton, New Jersey, *pro se*.

LAURA ETLINGER, Assistant Solicitor General (Barbara D. Underwood, Solicitor General; Andrea Oser, Deputy Solicitor General, *on the brief*), *for* Eric T. Schneiderman, Attorney General of the State of New York, Albany, New York, *for Defendants-Appellants*.

David B. Rubin, Esq., Metuchen, New Jersey, *for Amicus Curiae* The New Jersey State Bar Association, *in support of Plaintiff-Appellee*.

Leah M. Nicholls, Brian Wolfman, Institute for Public Representation, Washington, D.C., *for Amici Curiae* New York-Licensed Nonresident Attorneys, *in support of Plaintiff-Appellee*.

_____

REENA RAGGI, *Circuit Judge*:

On this appeal, we must decide whether New York violates the Constitution's Privileges and Immunities Clause, see U.S. Const. art. IV, § 2, by requiring nonresident members of its bar to maintain a physical "office for the transaction of law business" within the state, when resident attorneys are not required to maintain offices distinct from their homes, N.Y. Judiciary Law § 470. Having now received the New York Court of Appeals' response to our certified question as to the "minimum requirements necessary to satisfy" § 470's office mandate, see Schoenefeld v. New York, 748 F.3d 464 (2d Cir. 2014); Schoenefeld v. State, 25 N.Y.3d 22, 6 N.Y.S.3d 221 (2015) (holding § 470 to require physical office), we conclude that § 470 does not violate the Privileges and Immunities

3

Clause because it was not enacted for the protectionist purpose of favoring New York residents in their ability to practice law. To the contrary, the statute was enacted to ensure that nonresident members of the New York bar could practice in the state by providing a means, i.e., a New York office, for them to establish a physical presence in the state on a par with that of resident attorneys, thereby eliminating a service-of-process concern. We identify no protectionist intent in that action. Indeed, it is Schoenefeld who, in seeking to practice law in New York without a physical presence in the state, is looking to be treated differently from, not the same as, New York resident attorneys. Such differential treatment is not required by the Privileges and Immunities Clause. Accordingly, we reverse the judgment of the United States District Court for the Northern District of New York (Lawrence E. Kahn, *Judge*) declaring § 470's office requirement unconstitutional, see Schoenefeld v. New York, 907 F. Supp. 2d 252 (N.D.N.Y. 2011), and we remand the case with instructions to enter judgment in favor of defendants on Schoenefeld's Privileges and Immunities claim.[1]

---

[1] Because Schoenefeld has not appealed the district court's February 8, 2010 dismissal of her Equal Protection and Commerce Clause challenges to § 470, dismissal of her remaining Privileges and Immunities claim should conclude this litigation.

I.    **Background**

Because the facts and procedural history underlying this appeal are set forth in our prior panel opinion with which we assume familiarity, we reiterate them here only insofar as necessary to explain our decision to reverse and remand.

A.    The Privileges and Immunities Clause Challenge to N.Y. Judiciary Law § 470

Plaintiff Ekaterina Schoenefeld, a citizen and resident of New Jersey, is licensed to practice law in New Jersey, New York, and California. She maintains an office in New Jersey, but not in New York. She asserts that she has declined occasional requests to represent clients in New York state courts to avoid violating N.Y. Judiciary Law § 470, which states as follows:

> A person, regularly admitted to practice as an attorney and counsellor, in the courts of record of this state, whose office for the transaction of law business is within the state, may practice as such attorney or counsellor, although he resides in an adjoining state.

N.Y. Judiciary Law § 470 (McKinney 2016) (emphasis added). Schoenefeld seeks a judicial declaration that the office requirement imposed by § 470 on nonresident members of the New York bar violates the Constitution's Privileges and Immunities Clause by infringing on nonresidents' right to practice law in

New York. The district court agreed and, on the parties' cross-motions for summary judgment, declared § 470 unconstitutional. See Schoenefeld v. New York, 907 F. Supp. 2d at 262–66. This timely appeal followed.

B.    This Court's Certification to the New York Court of Appeals

In appealing the district court's ruling, New York State's Attorney General, on behalf of all defendants, initially argued that this case presented no Privileges and Immunities Clause concern because § 470's office requirement could be construed to demand only "an address for accepting personal service," which could be satisfied by a designated agent. Schoenefeld v. New York, 748 F.3d at 467. Alternatively, the Attorney General argued that, even if § 470 did treat nonresident attorneys differently from resident attorneys, it did not violate the Privileges and Immunities Clause because the burden imposed on nonresidents was "incidental" and substantially related to New York's sufficient state interest in the service of legal papers. Id.

Seeking to avoid a possibly unnecessary constitutional question, see Arizonans for Official English v. Arizona, 520 U.S. 43, 78–79 (1997) (explaining that, in confronting constitutional challenge to statute, court must first determine if any reasonable construction "will contain the statute within constitutional

6

bounds," and emphasizing that "[w]arnings against premature adjudication of constitutional questions bear heightened attention" where federal court is asked to invalidate state statute), but uncertain as to whether New York's highest court would, in fact, construe § 470 as urged by defendants, see Schoenefeld v. New York, 748 F.3d at 468–69 (observing that New York's lower courts had never interpreted § 470 to be satisfied by less than physical office space), this court certified the following question to the New York Court of Appeals:

> Under New York Judiciary Law § 470, which mandates that a nonresident attorney maintain an "office for the transaction of law business" within the state of New York, what are the minimum requirements necessary to satisfy that mandate?

Id. at 471.

The Court of Appeals accepted the certification and, upon review, held that § 470 "requires nonresident attorneys to maintain a physical office in New York." Schoenefeld v. State, 25 N.Y.3d at 25, 6 N.Y.S.3d at 222. In so ruling, the court observed that the statute, initially enacted in 1862, "appears to presuppose a residency requirement for the practice of law in New York State," to which "[i]t then makes an exception, by allowing nonresident attorneys to practice law if they keep an 'office for the transaction of law business'" in New York. Id. at 27, 6 N.Y.S.3d at 223. The Court acknowledged that the 1862 statute had linked the

7

office requirement to service of process, so that "service, which could ordinarily be made upon a New York attorney at his residence, could be made upon the nonresident attorney through mail addressed to his office." Id., 6 N.Y.S.3d at 224. But, the two statutory parts were severed in 1909, with the office requirement codified at § 470 making no reference to service. See id. at 27–28, 6 N.Y.S.3d at 224. In these circumstances, the Court of Appeals concluded that the term "office," as used in § 470, could not be construed to mean only an address or agent sufficient for the receipt of service. Rather, the plain meaning of "office," particularly when joined with "the additional phrase 'for the transaction of law business,'" requires "nonresident attorneys to maintain a physical office in New York." Id. at 25, 28, 6 N.Y.S.3d at 222, 224.

The Court of Appeals acknowledged a legitimate state interest in ensuring that personal service can be made on nonresident attorneys practicing in New York courts. But, in construing the statute, it observed that the "logistical difficulties" with service at the time the office requirement was enacted had largely been overcome by state law authorizing "several means of service upon a nonresident attorney, including mail, overnight delivery, fax and (where permitted) email," id. at 28, 6 N.Y.S.3d at 224 (citing N.Y. C.P.L.R. 2103(b)

8

(McKinney 2015)), as well as the court's own rule conditioning the admission of nonresident attorneys without full-time employment in New York upon their designation of "the clerk of the Appellate Division in their department of admission as their agent for the service of process," id., 6 N.Y.S.3d at 224–25 (citing N.Y. Comp. Codes R. & Regs. tit. 22, § 520.13(a) (2015)). Thus, the office requirement could not be construed to require only an address for service. The term was properly understood to require a physical premises.

Because the Court of Appeals' response to our certified question does not moot Schoenefeld's constitutional challenge to § 470, we proceed to address her claim and conclude that it fails on the merits.[2]

---

[2] Our dissenting colleague, Judge Hall, suggests that such a conclusion means it was unnecessary—and therefore improper—to certify the question of § 470's minimum requirements to the New York Court of Appeals. See Dissenting Op., post at 4–5, 6 n.1. This court, however, has recognized certification to be appropriate where a state statute is "fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question." Nicholson v. Scoppetta, 344 F.3d 154, 168 (2d Cir. 2003) (internal quotation marks omitted) (certifying state-law questions of statutory interpretation to New York Court of Appeals that would "render unnecessary, or at least substantially modify, the federal constitutional question"). That is this case. As our prior panel opinion explained, New York's Attorney General there argued that § 470 could be read to require only an address for accepting personal service, under which reading the Privileges and Immunities Clause would not be "implicate[d]." Schoenefeld v. New York, 748 F.3d at 467; see also id. at 469 (acknowledging that Supreme Court has "urged the federal courts of appeals to use certification in order to avoid deciding constitutional questions unnecessarily

9

## II.  Discussion

### A.  Standard of Review

We review an award of summary judgment <u>de novo</u>, and will affirm if "viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact." <u>Baldwin v. EMI Feist Catalog, Inc.</u>, 805 F.3d 18, 25 (2d Cir. 2015) (internal quotation marks and citation omitted). "Claims turning entirely on the constitutional validity or invalidity of a statute," such as the Privileges and Immunities challenge here, "are particularly conducive to disposition by summary judgment as they involve purely legal questions." <u>Connecticut ex rel. Blumenthal v. Crotty</u>, 346 F.3d 84, 93 (2d Cir. 2003).

---

or prematurely" (internal quotation marks omitted)).  Further, the Attorney General specifically requested certification if this court could not predict whether the New York Court of Appeals would adopt this reading.  <u>See</u> <u>Allstate Ins. Co. v. Serio</u>, 261 F.3d 143, 153–54 (2d Cir. 2001) (recognizing that "certification request merits more respectful consideration" where, among other things, request was made by Attorney General, who advanced possible saving construction of state statute (internal quotation marks and brackets omitted)). <u>Osterweil v. Bartlett</u>, 706 F.3d 139 (2d Cir. 2013), cited in the dissent, is not to the contrary, as we there certified a question of statutory interpretation to the New York Court of Appeals where, as here, one possible answer would resolve the litigation, while an alternative statutory construction would require this court "to decide the constitutional question."  <u>Id.</u> at 143.  Nor is a proper certification rendered improper because the state court does not approve the possible statutory construction that would have avoided or minimized the constitutional challenge.

B.    The Privileges and Immunities Clause

The Privileges and Immunities Clause states that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1. The Clause operates to "place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those states are concerned." Paul v. Virginia, 75 U.S. (8 Wall.) 168, 180 (1868); see Bach v. Pataki, 408 F.3d 75, 88 (2d Cir. 2005), overruled on other grounds by McDonald v. Chicago, 561 U.S. 742 (2010).[3] In short, the Clause does not demand that a citizen of one State be allowed to carry with him into another state the privileges and immunities which come with citizenship in his state. Rather, it guarantees "that in any State every citizen of any other State is to have the same privileges and immunities which the citizens of that State enjoy." Baldwin v. Fish & Game Comm'n of Mont., 436 U.S. 371, 382 (1978) (internal quotation marks omitted). It is toward that end that the Clause "prevents a State from discriminating against citizens of other States in favor of its own." Id. (internal quotation marks omitted).

---

[3] Although the Privileges and Immunities Clause speaks in terms of citizens, it is now well established that "for analytic purposes citizenship and residency are essentially interchangeable." Supreme Court of Va. v. Friedman, 487 U.S. 59, 64 (1988).

The Privileges and Immunities Clause, however, is "not an absolute" that precludes states from ever distinguishing between citizens and noncitizens. Supreme Court of Va. v. Friedman, 487 U.S. 59, 67 (1988); see Baldwin v. Fish & Game Comm'n of Mont., 436 U.S. at 383 (collecting cases and observing that state need not "always apply all its laws or all its services equally" to citizens and noncitizens). To prevail on a Privileges and Immunities challenge, a plaintiff must demonstrate that the state has burdened nonresident activity that is "sufficiently basic to the livelihood of the Nation as to fall within the purview of the Privileges and Immunities Clause." Supreme Court of Va. v. Friedman, 487 U.S. at 64 (internal quotation marks and alterations omitted). Upon such a showing, the state may defend its position by demonstrating that "substantial reasons exist for the discrimination and the degree of discrimination bears a sufficiently close relation to such reasons." Id. at 67; accord Connecticut ex rel. Blumenthal v. Crotty, 346 F.3d at 94. A court necessarily conducts these inquiries in light of the Supreme Court's recent admonition that constitutionally protected privileges and immunities are burdened "only when [challenged] laws were enacted for [a] protectionist purpose." McBurney v. Young, 133 S. Ct. 1709, 1715 (2013).

In McBurney, which was decided after the district court ruled in this case, a nonresident plaintiff challenged Virginia's Freedom of Information Act ("FOIA") for hampering his ability to pursue a common calling. He alleged that the law, by allowing only Virginia citizens to inspect and copy public records, abridged his ability to engage in the business of "request[ing] real estate tax records on clients' behalf from state and local governments." Id. at 1714–15. The Supreme Court acknowledged that the ability to pursue a common calling is protected by the Privileges and Immunities Clause. See id. at 1715. Nevertheless, it identified no unconstitutional burden because plaintiff had failed to "allege," and "ha[d] offered no proof," that the statute "was enacted in order to provide a competitive economic advantage for Virginia citizens." Id. To the contrary, the statute was enacted with the "distinctly nonprotectionist aim" of allowing "those who ultimately hold sovereign power," i.e., the citizens of Virginia, to "obtain an accounting from the public officials to whom they delegate the exercise of that power." Id. at 1716. The Supreme Court thus concluded that, even if the statute had "the incidental effect of preventing citizens of other States from making a profit by trading on information contained

in state records," in the absence of a showing of discriminatory purpose to favor state citizens, plaintiff could not pursue a Privileges and Immunities claim. Id.[4]

We do not understand McBurney to state any new principle of law. Nevertheless, McBurney provides a clarification not available to the district court at the time it ruled in this case, specifically, that the Privileges and Immunities Clause does not prohibit state distinctions between residents and nonresidents in the abstract, but "only" those "enacted for the protectionist purpose of burdening out-of-state citizens" with respect to the privileges and immunities afforded the state's own citizens. 133 S. Ct. at 1715; see Baldwin v. Fish & Game Comm'n of Mont., 436 U.S. at 380–81.

Nor do we understand McBurney to suggest that the disparate effects of a challenged state law are completely irrelevant to a Privileges and Immunities inquiry. As the Supreme Court has recognized in other contexts, burdensome effects can sometimes admit an inference of proscribed intent. Cf. Washington v.

---

[4] While "incidental" can mean "minor," the context in McBurney suggests that the Supreme Court used the word to mean something occurring "by chance or without intention or calculation." Webster's Third New International Dictionary 1142 (1986). Indeed, the Court has used the word in this manner in other discrimination cases. See, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 682 (2009) (rejecting equal protection challenge for failure plausibly to plead discriminatory intent, observing that it was "no surprise" that policy "produce[d] a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims" (emphases added)).

14

Davis, 426 U.S. 229, 241 (1976) (noting relevancy of disproportionate impact to racially discriminatory intent).  What McBurney makes plain, however, is that it is protectionist purpose, and not disparate effects alone, that identifies the sort of discrimination prohibited by the Privileges and Immunities Clause, by contrast, for example, to the Commerce Clause.  See generally McBurney v. Young, 133 S. Ct. at 1720 (separately analyzing challenged law under dormant Commerce Clause); cf. Comptroller of the Treasury of Md. v. Wynne, 135 S. Ct. 1787, 1801 n.4 (2015) (observing that "Commerce Clause regulates effects, not motives," and does not require court inquiry into "reasons for enacting a law that has a discriminatory effect").[5]  Thus, consistent with McBurney, a plaintiff challenging a law under the Privileges and Immunities Clause must allege or offer some proof of a protectionist purpose to maintain the claim.  In the absence of such a showing, a Privileges and Immunities claim fails, obviating the need for a tailoring inquiry.  See McBurney v. Young, 133 S. Ct. at 1716 (explaining that

---

[5] McBurney cannot be cabined as Judge Hall urges, to Privileges and Immunities challenges to non-economic legislation.  See Dissenting Op., post at 9–10.  Although Virginia's FOIA was not an economic regulation, McBurney's Privileges and Immunities analysis did not turn on that distinction but, rather, on the plaintiff's failure to adduce proof of protectionist purpose.  Indeed, the Court there held that "the Clause forbids a State from intentionally giving its own citizens a competitive advantage in business or employment."  McBurney v. Young, 133 S. Ct. at 1716 (emphasis added).

"Clause does not require that a State tailor its every action to avoid any incidental effect on out-of-state tradesmen").[6]

With these principles in mind, we consider Schoenefeld's challenge to § 470.

C.    Schoenefeld Has Adduced No Proof that § 470 Was Enacted for a Protectionist Purpose

Schoenefeld asserts that § 470 violates the Privileges and Immunities Clause both on its face and as applied.  Insofar as the law, both on its face and as

---

[6] McBurney did not specify at what step of the traditional two-step inquiry plaintiff must carry this protectionist-purpose burden.  The Ninth Circuit recently concluded that protectionist purpose is properly considered at the second step of inquiry.  See Marilley v. Bonham, 802 F.3d 958, 964 (9th Cir. 2015).  But the case is now awaiting en banc review.  See 815 F.3d 1178 (9th Cir. 2016) (mem.).  In any event, the panel conclusion in Marilley is not obvious because, at the second step of inquiry, the burden shifts to the defendants, see Supreme Court of Va. v. Friedman, 487 U.S. at 67, and McBurney emphasized the nonresident plaintiff's failure to plead or offer proof of a protectionist purpose for Virginia's FOIA, see 133 S. Ct. at 1715–16; cf., e.g., Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 270 n.21 (1977) (holding, in Equal Protection context, that if plaintiff demonstrates that challenged decision was "motivated in part by a racially discriminatory purpose," burden shifts to government to establish that "same decision would have resulted even had the impermissible purpose not been considered").  For this reason, we cannot readily assume, as our dissenting colleague does, that the Supreme Court's discussion of plaintiff's failure necessarily occurred at the second step of the traditional inquiry.  See Dissenting Op., post at 8–9.  However, we need not here conclusively decide at what step plaintiff must adduce proof of a protectionist purpose because, in any event, Schoenefeld's failure to carry this burden here defeats her Privileges and Immunities claim.

16

applied, pertains to the practice of law, the parties agree that § 470 implicates a privilege protected by the Privileges and Immunities Clause. See Supreme Court of N.H. v. Piper, 470 U.S. 274, 283 (1985); accord Supreme Court of Va. v. Friedman, 487 U.S. at 65. The parties also do not dispute that § 470 imposes a physical office requirement on nonresident attorneys that does not apply to resident attorneys, who may use their homes as their offices. See Schoenefeld v. New York, 748 F.3d at 468 (discussing New York precedent recognizing that resident New York attorney may use home as office).

In some circumstances, a facial classification is enough, by itself, to manifest a proscribed intent. This is most apparent where the facial classification is based on an invidious factor, such as race. See, e.g., Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227–36 (1995) (subjecting facial classifications based on race to strict scrutiny review). But precisely because the Privileges and Immunities Clause is not an absolute, not every facial distinction between state residents and nonresidents will admit an inference of protectionist purpose. See Supreme Court of Va. v. Friedman, 487 U.S. at 67. Indeed, in McBurney, the Supreme Court did not find the Virginia FOIA's facial distinction between residents and nonresidents sufficient to admit an inference of protectionist

17

purpose, particularly in light of statutory text and legislative history to the contrary. We reach the same conclusion with respect to § 470.

In reaching that conclusion we look, as the McBurney Court did with the Virginia FOIA, to the purpose of § 470.[7] That statute's office requirement has its origins in an 1862 predecessor law, Chapter 43, see 1862 N.Y. Laws 139, which was enacted to reverse a court ruling that barred a licensed New York attorney who had moved to New Jersey from further practicing in New York because it might be difficult, if not impossible, to serve him with New York legal process. See Richardson v. Brooklyn City & Newtown R.R., 22 How. Pr. 368 (N.Y. Sup. Ct. Feb. 1, 1862).[8] The month after that decision, the New York State legislature

---

[7] Because the policy underlying the Virginia FOIA was codified as part of the statutory text, the Supreme Court relied on the statute's plain language to determine its purpose. See McBurney v. Young, 133 S. Ct. at 1715 (quoting Va. Code Ann. § 2.2-3700(B) (2011)).

[8] The court in Richardson explained its concerns as follows:

> Section 409 of the Code regulates the manner of serving papers. It provides that service may be made upon an attorney at his office, by leaving the paper with the person in charge; or if there be no person in the office, by leaving it in a conspicuous place in the office; and if the office be not open to admit of such service, by leaving it at the attorney's residence with some person of suitable age and discretion. These various provisions, and especially the latter, would be rendered

18

enacted Chapter 43, making clear that such a nonresident lawyer could practice law in New York, as long as he maintained an office in the state, which office the law designated an accepted site for service, thereby eliminating the concern raised in Richardson. As this history demonstrates, the in-state office requirement was not enacted for the protectionist purpose of burdening nonresident attorneys in practicing law in New York. Rather, it was enacted to ensure that every licensed New York lawyer, whether a state resident or not, could practice in the state by providing a means for the nonresident attorney to establish a physical presence in the state (and therefore place for service) akin to that of a resident attorney. A statute enacted for such a nonprotectionist purpose is not vulnerable to a Privileges and Immunities challenge. See McBurney v. Young, 133 S. Ct. at 1715.

In 1877, Chapter 43's office requirement and office service authorization were codified at § 60 of New York's new Code of Civil Procedure. See

---

nugatory if attorneys who resided out of the state were permitted to practice. An attorney might keep his office closed and empty, and, if he had no residence within the state, might entirely evade the service of papers, and baffle his adversary and the court.

Id. at 370.

19

<u>Schoenefeld v. State</u>, 25 N.Y.3d at 27, 6 N.Y.S.3d at 224. In a 1909 recodification, however, the two provisions were divided, with the service part remaining at § 60, while the office requirement became § 470. As the New York Court of Appeals observed, the latter requirement has remained virtually unchanged to the present, while state law and court rules now authorize service by various means in addition to home and office. <u>See</u> <u>id.</u> at 28, 6 N.Y.S.3d at 224. But even if § 470's office requirement is now largely vestigial as a means for ensuring service, the fact remains that the law was enacted for that nonprotectionist purpose, and Schoenefeld has adduced no evidence of a protectionist intent to afford some economic advantage to resident New York lawyers.

In urging otherwise, Schoenefeld argues that Chapter 43 must be viewed in context, as an exception to what was then New York's general ban on nonresident attorneys. The argument fails because Schoenefeld has not been burdened by that general ban, which was invalidated in 1979. <u>See</u> <u>In re Gordon</u>, 48 N.Y.2d 266, 422 N.Y.S.2d 641 (1979). Further, she offered no proof that the office requirement was enacted to further the general ban so as to admit an inference of protectionist intent. Rather, as just noted, the office requirement was enacted as an exception to the ban, ensuring an in-state place of service so that,

once admitted, nonresident New York lawyers could practice in the state's courts on functionally the same terms as resident lawyers.

No more can a protectionist purpose be inferred from the 1877 and 1909 recodifications of the office requirement or from New York's failure thereafter to repeal § 470. After the New York Court of Appeals struck down the state's general ban on the admission of nonresident lawyers, see In re Gordon, 48 N.Y.2d at 269, 422 N.Y.S.2d at 642–43, the legislature "amended several provisions of the Judiciary Law and the CPLR to conform to that holding," Schoenefeld v. State, 25 N.Y.3d at 28, 6 N.Y.S.3d at 224. Schoenefeld offers no evidence that anyone identified a need to repeal § 470 as part of that process, much less that the legislature thereafter refused to do so for the protectionist purpose of favoring resident attorneys. See McBurney v. Young, 133 S. Ct. at 1715.[9] Where a legislature thus manifests its readiness to conform its laws to the

_____

[9] As Judge Hall notes, the legislature did propose an amendment to § 470 in 1986 that was not enacted. See Dissenting Op., post at 20 n.11. But that amendment would still have "mandate[d] that a nonresident attorney have a law office in [New York] before appearing as an attorney of record in any action or proceeding in a court [in the state]." J.A. 132. The amendment's proponents explained that while New York could not limit bar membership to state residents, "it could act to insure the quality of its Bar by adopting reasonable measures that would have special regulatory effect on nonresident attorneys." Id. Insofar as Judge Hall contends that the amendment would have permitted nonresident attorneys without an office in New York to practice in the state so

21

Privileges and Immunities Clause, a plaintiff must point to more than a failure to amend or repeal a statute enacted for a nonprotectionist purpose to demonstrate that the law is being maintained for a protectionist purpose.[10]  The subsequent availability of other means of service warrants no different conclusion because, in the absence of some showing of protectionist purpose, a state need not demonstrate that its laws are narrowly tailored to a legitimate purpose.  See id. at 1716 (rejecting Privileges and Immunities claim for failure to demonstrate protectionist purpose without conducting tailoring inquiry).

---

long as they did not appear as attorneys of record, see Dissenting Op., post at 20 n.11, that conclusion appears grounded not in the amendment's text, but in pro hac vice rules existing to this day.  See N.Y. Comp. Codes R. & Regs. tit. 22, § 520.11 (2016) (permitting member of bar of another state to be admitted pro hac vice provided that, inter alia, attorney is associated with member in good standing of New York bar "who shall be the attorney of record in the matter"); J.A. 133 (explaining that proposed 1986 amendment to § 470 would not "unduly burden[]" nonresident attorney who was "unwilling or unable to maintain" an in-state office because that attorney could practice "so long as local counsel c[ould] be found to appear as attorney of record").

[10] A recent statutory amendment and a newly-promulgated rule of the New York Court of Appeals, cited to us by the parties in Fed. R. App. P. 28(j) letters, further indicate that New York is not pursuing a protectionist purpose in regulating the practice of law.  See N.Y. C.P.L.R. 2103(b)(2) (McKinney 2016) (approving service by mail "made from outside the state"); N.Y. Comp. Codes R. & Regs. tit. 22, § 523.2 (2016) (permitting lawyer not admitted in New York to engage in temporary practice of law within state provided, among other things, that lawyer is licensed to practice in another state or even "a non-United States jurisdiction").

22

Further, this is not a case where the alleged burdensome effects of the challenged statute admit an inference of protectionist purpose.[11] While § 470's office requirement expressly pertains only to nonresident attorneys, the requirement serves, as we have already observed, to place admitted resident and nonresident attorneys on an equal footing, not to favor the former over the latter. To practice law in New York, <u>every</u> attorney admitted to its bar must have a presence in the state in the form of a physical premises.[12] The fact that a

---

[11] The law of the case doctrine does not bar us from reaching this conclusion because contrary to our dissenting colleague's suggestion, <u>see</u> Dissenting Op., <u>post</u> at 3–5, 22–23, neither our prior panel opinion nor the New York Court of Appeals' response thereto conclusively decided the issue. <u>See</u> <u>DiLaura v. Power Auth. of State of N.Y.</u>, 982 F.2d 73, 76 (2d Cir. 1992). Our prior panel opinion decided only to certify the question of § 470's minimum requirements to the New York Court of Appeals in light of a statutory construction then urged by the Attorney General that might moot Schoenefeld's constitutional challenge. In this context, our observation that, if construed to require a physical office, § 470 imposed a "significant expense" on nonresident attorneys, <u>Schoenefeld v. New York</u>, 748 F.3d at 468, is at most <u>dictum</u> that does not bind us here, <u>see</u> <u>Schwabenbauer v. Bd. of Educ. of City School Dist. of City of Olean</u>, 777 F.2d 837, 842 (2d Cir. 1985) (concluding that statements in prior opinion in same case were "not necessary to or a part of" prior decision and were, therefore, non-binding <u>dicta</u>). Meanwhile, the New York Court of Appeals held only that § 470 required nonresident attorneys to maintain a physical office in the state. <u>See</u> <u>Schoenefeld v. State</u>, 25 N.Y.3d at 26–27, 6 N.Y.S.3d at 223.

[12] Thus, this case is not akin to <u>Friedman</u> and <u>Piper</u>, cited by the dissent. <u>See</u> Dissenting Op., <u>post</u> at 21, 24 (citing <u>Supreme Court of Va. v. Friedman</u>, 487 U.S. at 70 (concluding that Virginia rule permitting only residents to be admitted to bar on motion, while nonresidents were required to take and pass bar

23

nonresident attorney will have to establish that presence by leasing an office, while a resident attorney can use his home, does not unduly burden the nonresident. Not only is the expense of a New York office likely to be less than the expense of a New York home, but Schoenefeld has adduced no evidence indicating that significant numbers of resident New York attorneys in fact practice from their homes rather than from offices. Indeed, decisions from sister circuits suggest otherwise. Cf. Kleinsmith v. Shurtleff, 571 F.3d 1033, 1038 (10th Cir. 2009) (observing that, although trust statute would permit Utah attorneys to use home as requisite place of business within state, it was hardly apparent that many would wish to do so); Tolchin v. Supreme Court of N.J., 111 F.3d 1099, 1107–08 (3d Cir. 1997) (noting lack of evidence that, in New Jersey, attorneys practice from their homes).

Schoenefeld nevertheless contends that § 470 is unconstitutional because the statute, as applied, requires her to incur the costs of a New York office when she is already incurring the costs of her New Jersey home and office. The flaw in this argument is that Schoenefeld's New Jersey expenses are not a product of

_____

examination, violated Privileges and Immunities Clause); Supreme Court of N.H. v. Piper, 470 U.S. at 288 (holding that New Hampshire rule excluding nonresidents from bar violated Clause)).

24

New York law.  New York can be held to account under the Privileges and Immunities Clause only for the condition it imposes on Schoenefeld to practice law in the state, that is, the leasing of an office.  As noted, Schoenefeld fails to show that the burden on a nonresident of maintaining an office in New York is greater than the burden on a resident of maintaining a home (and frequently a home and office) in New York.  In any event, the Privileges and Immunities Clause "'does not promise nonresidents that it will be as easy for [them] as for residents to comply with a state's law.'"  Schoenefeld v. New York, 748 F.3d at 467 (quoting Kleinsmith v. Shurtleff, 571 F.3d at 1044–45 (observing that "typically it is harder for a nonresident to conduct a business or a profession in a state than it is for a resident")).  It promises only that state laws will not differentiate for the protectionist purpose of favoring residents at the expense of nonresidents.  See McBurney v. Young, 133 S. Ct. at 1715.  The effects resulting from § 470's application to Schoenefeld manifest no such protectionist intent.

Indeed, the effects of § 470, as applied, are no different from those of a law that on its face requires all attorneys to maintain a physical presence in New York.  Sister circuits have upheld such statutes against Privileges and Immunities challenges.

For example, <u>Kleinsmith v. Shurtleff</u> involved a Privileges and Immunities challenge to a Utah statute requiring "all attorneys who act as trustees of real-property trust deeds in Utah to 'maintain[] a place within the state.'" 571 F.3d at 1035 (alteration in original) (quoting Utah Code Ann. § 57-1-21(1)(a)(i) (2009)). Plaintiff argued that the law discriminated against nonresidents because residents could use their homes as the specified "place within the state," while nonresidents would need to lease offices. <u>Id.</u> at 1044. The Tenth Circuit, however, held that the law was neutral because it equally required all trustees to have a physical presence in the state. <u>See id.</u> at 1044–47. In reaching this conclusion, the court relied on the statute's lack of facial classification between residents and nonresidents. <u>See id.</u> at 1046. But insofar as plaintiff complained of a disparate impact as applied, the court held it "irrelevant to the [Privileges and Immunities] Clause whether the practical effect of the maintain-a-place requirement . . . burdens nonresidents disproportionately." <u>Id.</u> at 1047.

Similarly, in <u>Tolchin v. Supreme Court of New Jersey</u>, the Third Circuit upheld a New Jersey law requiring all attorneys to maintain a "<u>bona fide</u> office" within the state, while recognizing that only resident attorneys could use their homes to satisfy the requirement. 111 F.3d at 1107–08. As in <u>Kleinsmith</u>, the

court identified no Privileges and Immunities Clause violation because the law "similarly affect[s] residents and nonresidents. Resident and nonresident attorneys alike must maintain a New Jersey office." Id. at 1113.[13]

While the laws at issue in these two cases did not facially classify on the basis of residence, to the extent Schoenefeld complains of the burdensome effects of § 470 as applied, facial classification is irrelevant. The effects of § 470 and the laws at issue in Kleinsmith and Tolchin are virtually identical. The critical question, then, is whether a law that effectively requires nonresident attorneys to maintain a physical presence in New York akin to that already maintained by resident attorneys unduly burdens the former's ability to practice law. Like the

---

[13] New Jersey has since eliminated its physical office requirement, while continuing to impose various conditions that may most easily be satisfied through an office. See N.J. R. Ct. 1:21-1(a)(1) (2015) ("An attorney need not maintain a fixed physical location for the practice of law, but must structure his or her practice in such a manner as to assure, as set forth in RPC 1.4, prompt and reliable communication with and accessibility by clients, other counsel, and judicial and administrative tribunals before which the attorney may practice, provided that an attorney must designate one or more fixed physical locations where client files and the attorney's business and financial records may be inspected on short notice by duly authorized regulatory authorities, where mail or hand-deliveries may be made and promptly received, and where process may be served on the attorney for all actions . . . that may arise out of the practice of law and activities related thereto."). We need not here consider whether New York might do the same because, absent a protectionist purpose, the conditions imposed by a state even on nonresidents pursuing a profession within its borders do not implicate the Privileges and Immunities Clause so as to require tailoring analysis. See McBurney v. Young, 133 S. Ct. at 1716.

Third and Tenth Circuits, we conclude that it does not. The conclusion finds further support in dictum in Supreme Court of Virginia v. Friedman, wherein the Supreme Court recognized that an in-state office requirement could serve as a nonprotectionist alternative to residency in safeguarding state interests respecting the practice of law. See 487 U.S. at 70 (invalidating residency condition for admission on motion to bar and observing that office requirement adequately protected state interest in limiting such admissions to full-time practitioners); see generally Newdow v. Peterson, 753 F.3d 105, 108 n.3 (2d Cir. 2014) (acknowledging "obligation to accord great deference to Supreme Court dicta, absent a change in the legal landscape" (internal quotation marks omitted)).[14]

---

[14] Frazier v. Heebe, 482 U.S. 641 (1987), cited by Judge Hall, is not to the contrary. See Dissenting Op., post at 17 & n.9. In there concluding that the United States District Court for the Eastern District of Louisiana could not impose an in-state office requirement for admission to its bar, the Supreme Court relied on its supervisory authority over local federal rules and expressly declined to reach the Privileges and Immunities challenge. See Frazier v. Heebe, 482 U.S. at 645, 647 n.7 (explaining that Court's supervisory authority permits it to intervene to protect integrity of federal system, whereas "authority over state-court bars is limited to enforcing federal constitutional requirements" (emphasis added)); see also id. (stating that rules differentiating between resident and nonresident attorneys are "more difficult to justify in the context of federal-court practice than they are in the area of state-court practice").

What Schoenefeld in fact seeks through this action is not to practice law in New York on the same conditions as a resident attorney who by virtue of home (or home and office) maintains a physical presence in the state. Rather, she seeks to practice law on different terms, specifically, without maintaining a physical presence in the state. The Privileges and Immunities Clause proscribes laws that favor residents over nonresidents in their pursuit of a common calling. It does not mandate that nonresidents be allowed to practice law in a state on terms different from those applicable to residents.

Accordingly, whether Schoenefeld challenges § 470 on its face or as applied, her Privileges and Immunities Clause claim fails because she has not demonstrated that the law was enacted for or serves the protectionist purpose of favoring resident New York attorneys and disfavoring nonresident attorneys in practicing law in the state's courts. See McBurney v. Young, 133 S. Ct. at 1715. We therefore reverse the district court decision declaring § 470 violative of the Privileges and Immunities Clause.

III.    Conclusion

To summarize, we conclude as follows:

1.      The Supreme Court has recently clarified that state laws violate the Privileges and Immunities Clause "only when those laws were enacted for the

29

protectionist purpose of burdening out-of-state citizens." McBurney v. Young, 133 S. Ct. at 1715.

2.    New York's in-state office requirement for nonresident attorneys admitted to the state's bar, N.Y. Judiciary Law § 470, was not enacted for a protectionist purpose disfavoring nonresident admitted attorneys but, rather, for the nonprotectionist purpose of affording such attorneys a means to establish a physical presence in the state akin to that of resident attorneys, thereby eliminating a court-identified service-of-process concern.

3.    Schoenefeld has offered no proof of an animating protectionist purpose, either on the face of the statute or inferred from its effects as applied. Indeed, the effect of § 470, as applied, is no different from a neutral statute requiring all licensed New York attorneys, resident and nonresident alike, to maintain a physical presence in the state, which raises no Privileges and Immunities concern.

4.    Schoenefeld cannot point to the expenses of her practice in New Jersey, not required by New York law, to pursue a Privileges and Immunities challenge to § 470 in the absence of any proof that that statute's in-state office requirement was enacted for a protectionist purpose.

Accordingly, we REVERSE the district court's judgment invalidating § 470, and we REMAND the case with instructions to deny Schoenefeld's motion for summary judgment and to award judgment in favor of defendants.

HALL, *Circuit Judge*, dissenting:

The majority holds that a New York statute that discriminates, on its face, against nonresident attorneys—burdening them with the expense of maintaining an office in New York while exempting resident attorneys from the same requirement—does not offend the Privileges and Immunities Clause of Article IV, § 2 of the Constitution because, in the majority's view, the plaintiff has failed to prove that the statute evinces a "protectionist" intent. In doing so, the majority injects an entirely novel proposition into our Privileges and Immunities Clause jurisprudence: that a State's explicit discrimination against nonresidents with regard to a fundamental right is constitutionally unobjectionable unless the nonresident makes out a *prima facie* case of discriminatory intent. Such a holding reverses the State's burden of demonstrating that it has a substantial interest justifying the discrimination and that the means chosen bear a close and substantial relation to that interest. Even under the majority's reformulation of our settled law, however, Schoenefeld has established that the New York statute has protectionist aims, and the State's proffered justifications for the discrimination fail to survive scrutiny. I respectfully dissent.

I.

The two-step inquiry to be conducted under the Privileges and Immunities Clause is well established. First, the court considers whether a State has, in fact, discriminated against out-of-staters with regard to the privileges and immunities it accords its own citizens. *See Connecticut ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 94 (2d Cir. 2003) (citing *United Bldg. & Constr. Trades Council v. Mayor & Council of Camden*, 465 U.S. 208, 218, 222 (1984)). "The activity in question must be sufficiently basic to the livelihood of the Nation . . . as to fall within the purview of the Privileges and Immunities Clause . . . . For it is only with respect to those 'privileges' and 'immunities' bearing on the vitality of the Nation as a single entity that a State must accord residents and nonresidents equal treatment." *Supreme Court of Va. v. Friedman*, 487 U.S. 59, 64–65 (1988) (internal quotation marks, citations and alterations omitted). Second, if the court determines that the State has, in fact, discriminated against out-of-state residents, the burden shifts to the State to provide a "sufficient justification for the discrimination," *Crotty*, 346 F.3d at 94, by making a showing that "(i) there is a substantial reason for the difference in treatment; and (ii) the discrimination practiced against

2

nonresidents bears a substantial relationship to the State's objective." *Supreme Court of N.H. v. Piper*, 470 U.S. 274, 284 (1985).

On its face, New York Judiciary Law § 470 discriminates against nonresident attorneys with regard to the practice of law, long recognized by the Supreme Court as a "fundamental right" subject to protection under the Privileges and Immunities Clause. *Id.* at 281. As we explained in our prior opinion in this case, *Schoenefeld v. New York*, 748 F.3d 464 (2d Cir. 2014), and the New York Court of Appeals unanimously agreed after we certified to it a question, *Schoenefeld v. State*, 25 N.Y.3d 22, 6 N.Y.S.3d 221 (2015), Section 470 draws a distinction between attorneys who are residents of New York and those who are not. The statute imposes no specific requirement on resident attorneys to maintain a *bona fide* office, thus permitting them to set up an "office" on the kitchen table of their studio apartments if so desired. *Schoenefeld*, 748 F.3d at 468. Nonresident attorneys, however, are required to maintain an "office for the transaction of law business" within the State. N.Y. Judiciary Law § 470. We recognized that "[t]his additional obligation carries with it significant expense—rents, insurance, staff, equipment *inter alia*—all of which is in addition to the expense of the attorney's out-of-state office, assuming she has one." *Schoenefeld*,

3

748 F.3d at 468. Absent a controlling state decision that an "office for the transaction of law business," § 470, meant something other than a *bona fide* office, we concluded that, "as it stands, it appears that Section 470 discriminates against nonresident attorneys with respect to their fundamental right to practice law in the state and, by virtue of that fact, its limitations on nonresident attorneys implicate the Privileges and Immunities Clause." *Id.* at 469.

New York argued to us, however, that the statute could be interpreted as requiring no more than a P.O. box or designated agent for service of process, lessening the burden on nonresident attorneys considerably and making Section 470 more likely to survive scrutiny. *Id.* While our own review of New York law indicated that a designated physical office space was required, we recognized that the question had not been spoken to by the New York Court of Appeals, and we certified to that court the question: "Under New York Judiciary Law § 470, which mandates that a nonresident attorney maintain an 'office for the transaction of law business' within the state of New York, what are the minimum requirements necessary to satisfy that mandate?" *Id*. at 471. In doing so, we represented that the Court of Appeals' answer would, "in all likelihood, dictate[] the outcome of the constitutional privileges and immunities analysis we have

4

commenced and must complete as we decide the appeal before us." *Id*. The Court of Appeals accepted certification and graciously took time away from its own busy docket to unanimously answer that § 470 required the nonresidents maintain a physical office space. *Schoenefeld*, 25 N.Y.3d at 26, 6 N.Y.S.3d at 223. As we had suspected, maintaining an address or a designated agent for service would not satisfy the requirements of Section 470. *See id.*

The majority now disregards the New York Court of Appeals' decision as well as our own prior opinion which, together, constitute the law of the case. *See DiLaura v. Power Auth. of State of N.Y.*, 982 F.2d 73, 76 (2d Cir. 1992) (noting that, absent an intervening change in controlling law, availability of new evidence, or the need to correct a clear error or manifest injustice, a court's decision upon a rule of law "should continue to govern the same issues in subsequent stages in the same case") (internal quotation marks omitted). Those decisions acknowledged that Section 470 discriminates between in-state and out-of-state attorneys solely on the basis of their residency. Under longstanding precedent, that determination disposes of the initial inquiry; the burden then shifts to the State to provide "sufficient justification for the discrimination." *Crotty*, 346 F.3d at 94. Departing from these precedents, however, the majority holds that the

5

*plaintiff* bears the initial burden of "alleg[ing] or offer[ing] some proof of a protectionist purpose" in order to state a claim under the Privileges and Immunities Clause. Majority Op., ante at 15. In the majority's estimation, if the plaintiff fails to allege a *prima facie* case of protectionist intent, her "Privileges and Immunities claim fails, obviating the need for a tailoring inquiry." Majority Op., ante at 15.

The majority bases its reasoning exclusively on its reading of the Supreme Court's decision in *McBurney v. Young*, 133 S. Ct. 1709 (2013). As the majority acknowledges, that decision did not state any new principle of law, but merely confirmed that the Privileges and Immunities Clause forbids laws that abridge the right to pursue a common calling only when those laws "were enacted for the protectionist purpose of burdening out-of-state citizens."[1] *Id.* at 1715. *McBurney*

---

[1] The majority's application of *McBurney*, which was decided before our prior opinion in this case, is particularly striking given that we did not rely on *McBurney* to uphold the constitutionality of Section 470 at that time. *See Schoenefeld*, 748 F.3d at 469. Instead, in apparent contravention of New York's constitutional requirements for certification, this Court certified a question to the Court of Appeals that was not necessary to our decision. *Cf. Osterweil v. Bartlett*, 706 F.3d 139, 142 (2d Cir. 2013) (stating that, prior to certifying a question to the Court of Appeals, this Court must determine "whether the certified question is determinative of a claim before us" (internal quotation omitted)); *Retail Software Servs., Inc. v. Lashlee*, 71 N.Y.2d 788, 790, 530 N.Y.S.2d 91, 92 (1988) (declining to

did not disturb the traditional threshold inquiry and two-step analysis in cases, like ours, where the challenged law is one that directly regulates legal practice. Rather, while acknowledging that the Privileges and Immunities Clause "protects the right of citizens to ply their trade, practice their occupation, or pursue a common calling," *id.* (internal quotation marks omitted), the Court held that Virginia's distinction between state citizens and noncitizens in its Freedom of Information Act ("FOIA") did not "abridge" a noncitizen's right to pursue his livelihood "in the sense prohibited by the Privileges and Immunities clause" because the effects on his real estate business, which involved obtaining state property records for his clients, were purely incidental. *Id.*

The majority's reading that *McBurney* requires a plaintiff to allege, as part of a *prima facie* case, that the law was specifically enacted for a protectionist

---

answer certified question because it did not satisfy the requirement that it "may be determinative" of the pending action, as required by the New York Constitution). As we recognized in our prior opinion, "[t]he constitutionality of [Section] 470 turns on the interpretation of a provision of the statute that implicates significant New York state interests and is determinative of this appeal." *Schoenefeld*, 748 F.3d at 467.

purpose misconstrues *McBurney*'s invocation of the two-step analysis.[2]  As an initial matter, the Court resolved the threshold issue, whether a fundamental right is implicated, by noting that the Privileges and Immunities Clause protects the right the plaintiff claimed was violated.[3]  *See id.* at 1715.  The Court then considered whether sufficient justification existed for the discrimination[4]; it determined that the Virginia FOIA, as a mechanism for state citizens as the

[2] Rather than unanimously altering the longstanding Privileges and Immunities analysis through *dicta* without acknowledging as much (or generating a single dissenting opinion), the better reading is that the *McBurney* decision adhered to the traditional two-step analysis.

[3] The Court, by contrast, rejected the plaintiff's Privileges and Immunities challenge based on the asserted "right to access public information on equal terms with citizens of the Commonwealth" at the threshold by determining that the Clause did not "cover[] this broad right."  *McBurney*, 133 S. Ct. at 1718–19.

[4] The majority states that it is "not obvious" under *McBurney* whether the State's protectionist purpose is properly considered at the first or second step of the inquiry, noting that the burden shifts to the defendants at the second step, *see, e.g., Supreme Court of Va. v. Friedman*, 487 U.S. at 67, whereas *McBurney* emphasized the nonresident plaintiff's failure to plead or allege proof that Virginia's FOIA was enacted with a protectionist purpose, *see* 133 S. Ct. at 1715–16.  Majority Op., ante at 16.  The tension the majority perceives between *Friedman* and *McBurney*, however, is due entirely to a strained reading of *McBurney*.  The majority's "discriminatory intent" requirement, in any event, remains novel to privileges and immunities jurisprudence whether it is grafted onto the first or second step of the inquiry.

holders of sovereign power to obtain an accounting from public officials, evinced a "distinctly nonprotectionist aim." *Id*. at 1716. Further, the statute's distinction between Virginia citizens and noncitizens was justified because it "recognizes that Virginia taxpayers foot the bill for the fixed costs underlying recordkeeping in the Commonwealth." *Id.* It was within this context that the Court explained that (1) the plaintiff "does not allege—and has offered no proof—that the challenged provision of the Virginia FOIA was enacted in order to provide a competitive economic advantage for Virginia citizens," *id.* at 1715, and (2) the statute's "effect of preventing citizens of other States from making a profit by trading on information contained in state records" is merely "incidental." *Id.* at 1716. In short, the Court's reasoning—that the plaintiff failed to contradict the State's showing that the discrimination against noncitizens was justified—conforms precisely to the traditional two-step inquiry.

   *McBurney* is distinguishable from this case for the simple reason that the Virginia FOIA is not an economic regulation, nor does it directly regulate the right to pursue a common calling. Rather, the FOIA provides a mechanism for seeking political accountability, and its effects on the plaintiff's profession—data gathering for profit—were purely "incidental." *Id*. It is well-established that,

9

"[w]hile the Clause forbids a State from intentionally giving its own citizens a competitive advantage in business or employment, the Clause does not require that a State tailor its every action to avoid any incidental effect on out-of-state tradesmen." *Id.* Section 470, by contrast, directly regulates the legal profession by expressly and intentionally placing practice requirements on nonresident attorneys like Schoenefeld that it does not place on resident attorneys. The majority stretches *McBurney*'s "incidental" language far beyond the facts of that case to support its conclusion that *any* regulation, even one that directly regulates a "well settled . . . privilege protected by Article IV, § 2," *Barnard v. Thorstenn*, 489 U.S. 546, 553 (1989), will pass constitutional muster so long as its discrimination against nonresidents can be characterized as "incidental." Majority Op., ante at 13–14.

By requiring plaintiffs to allege a *prima facie* case of discriminatory intent, the majority, in effect, relieves the State of its burden to provide a sufficient justification for laws that discriminate against nonresidents with regard to fundamental rights. *See Crotty*, 346 F.3d at 95 (explaining that States may not "treat residents and nonresidents disparately in connection with the pursuit of commerce, a trade, or business venture where that disparate treatment is not

supported by a sufficient justification"). Determining whether an unacceptable purpose, such as economic protectionism, underlies the challenged law is at the core of the analysis engaged in *after* the threshold determination into whether a right implicated by the Privileges and Immunities Clause has been abridged. *See Piper*, 470 U.S. at 284 ("The conclusion that [a State law] deprives nonresidents of a protected privilege does not end our inquiry . . . The Clause does not preclude discrimination against nonresidents where (i) there is a substantial reason for the difference in treatment; and (ii) the discrimination practiced against nonresidents bears a substantial relationship to the State's objective."). Examining the government's proffered reason for the discrimination and determining whether the challenged law, as enacted, conforms to the proffered reason is the method by which courts determine whether the proffered reason is genuine or merely a pretext for economic protectionism. *Crotty*, 346 F.3d at 97 ("Part and parcel to this analysis is determining whether [the State] ha[s] demonstrated a substantial factor unrelated to economic protectionism to justify the discrimination."). The majority's reasoning would reverse this burden-shifting test by requiring plaintiffs to show that a law *was* enacted for a protectionist purpose, rather than

11

requiring the State to show that the law was *not* enacted for a protectionist purpose.

Tellingly, in support of this proposition the majority draws exclusively on cases addressing challenges under the Equal Protection Clause, for which plaintiffs must plead discriminatory intent as part of a *prima facie* case. Majority Op., ante at 13–14 (citing, *e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009); *Washington v. Davis*, 426 U.S. 229, 241 (1976)). The majority has not cited, nor does there exist, any case suggesting that the requirement to allege discriminatory intent as part of a *prima facie* case under the Equal Protection Clause also applies to Privileges and Immunities claims. Indeed, *Virginia v. Friedman*, 487 U.S. 59 (1988), stands for the opposite proposition. In *Friedman*, Virginia argued that its residency requirement for admission to the State's bar on motion did not implicate the Privileges and Immunities Clause on the basis that, because nonresident attorneys could seek admission by taking the Virginia bar exam, "the State cannot be said to have discriminated against nonresidents as a matter of fundamental concern." *Id*. at 65 (internal quotation marks omitted). The Supreme Court rejected that argument as "quite inconsistent with our precedents," stating that "the Clause is implicated whenever . . . a State does not

permit qualified nonresidents to practice law within its borders on terms of substantial equality with its own residents." *Id*. at 65–66. This language cannot be squared with a *prima facie* requirement that demands something more than a showing of disparate treatment on the face of the statute.[5]

The Equal Protection cases cited by the majority, moreover, are distinguishable on the ground that the challenged policies in those cases were facially neutral but produced racially disparate effects. *See Iqbal*, 556 U.S. at 682 (holding that plaintiffs failed to allege that detention policy that disproportionately affected Muslims and Arabs was motivated by a racially

---

[5] By comparing this case with *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977), the majority inadvertently highlights the distinctions between the burden-shifting tests that govern Equal Protection and Privileges and Immunities claims. Majority Op., ante at 16 n.6. In *Village of Arlington Heights*, an Equal Protection case, the Court explained that if a plaintiff demonstrates that a challenged decision was "motivated in part by a racially discriminatory purpose," then the burden shifts to the government to establish that the "same decision would have resulted even had the impermissible purpose not been considered." *Id.* at 270 n.21. To state a claim under the Privileges and Immunities Clause, by contrast, a plaintiff must demonstrate that "a challenged restriction deprives nonresidents of a privilege or immunity protected by this Clause," *Barnard*, 489 U.S. at 552, in which case the restriction is invalid unless "(i) there is a substantial reason for the difference in treatment; and (ii) the discrimination practiced against nonresidents bears a substantial relationship to the State's objective," *id.* The former inquiry requires a threshold showing of discriminatory intent; the latter plainly does not.

13

discriminatory purpose); *Davis*, 426 U.S. at 244 (concluding that facially neutral employment test was not racially discriminatory simply because a greater proportion of African Americans fared poorly). The plaintiffs were thus required to allege facts showing that an otherwise-neutral policy was motivated by an impermissible discriminatory purpose. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283–84 (1977). Section 470, by contrast, draws a facial distinction between residents and nonresidents with regard to the privilege of practicing law; by its very terms, it imposes burdens on nonresidents that it does not impose on residents. Because the statute, on its face, discriminates against nonresidents, no other threshold showing of discriminatory intent is required.[6]

In sum, Section 470 discriminates against nonresidents with respect to the practice of law, a fundamental right long recognized as protected under the Privileges and Immunities Clause. The majority recognizes as much, *see* Majority Op., ante at 16–17, but erroneously imposes a threshold requirement that the

---

[6] Indeed, even a state regulation that "d[oes] not on its face draw any distinction based on citizenship or residence" may implicate the Privileges and Immunities Clause where "the practical effect of the provision [is] discriminatory." *Hillside Dairy Inc. v. Lyons*, 539 U.S. 59, 67 (2003).

14

plaintiff challenging the discrimination prove there is a protectionist intent above and beyond the traditional analysis.

                                    II.

Plaintiff having established that a fundamental right has been implicated, it is the State's burden to provide a sufficient justification for the discrimination by demonstrating that "(i) there is a substantial reason for the difference in treatment; and (ii) the discrimination practiced against nonresidents bears a substantial relationship to the State's objective." *Piper*, 470 U.S. at 284. "In deciding whether the degree of discrimination bears a sufficiently close relation to the reasons proffered by the State, the Court has considered whether, within the full panoply of legislative choices otherwise available to the State, there exist alternative means of furthering the State's purpose without implicating constitutional concerns." *Friedman*, 487 U.S. at 66.

The State's proffered justifications for the in-state office requirement— effectuating service of legal papers, facilitating regulatory oversight of nonresident attorneys' fiduciary obligations, and making attorneys more accessible to New York's courts—are plainly not sufficient. Regarding the issue of service, the Court of Appeals itself observed that, although "service on an out-

15

of-state individual presented many more logistical difficulties in 1862, when [Section 470] was originally enacted," today there are "adequate measures in place relating to service upon nonresident attorneys," including the methods of mail, overnight delivery, fax and (where permitted) email, as authorized by the CPLR, and the requirement under 22 N.Y.C.R.R. § 520.13(a) that nonresident attorneys designate an in-state clerk of court as their agent for service of process in order to be admitted in New York. *Schoenefeld*, 25 N.Y.3d at 28, N.Y.S.3d at 224–25. Thus, not only do "there exist alternative means of furthering the State's purpose without implicating constitutional concerns," *Friedman*, 487 U.S. at 66, but those means are already in place.[7]

The State's argument that an in-state office requirement is necessary to regulate the behavior of nonresident attorneys fares no better. The Court has

---

[7] As the majority notes, New Jersey has eliminated its physical office requirement in favor of various other less onerous conditions. *See* Majority Op., ante at 27 n.13. Further, the New York City Bar permits resident attorneys to maintain a "virtual law office" in New York even if their practice is located primarily out of state, a privilege that is not afforded to in-state residents. Assoc. of the Bar of the City of New York Comm. on Prof. Ethics, Formal Opinion 2014-2: Use of a Virtual Law Office by New York Attorneys (June 2014), *available at* http://www.nycbar.org/ethics/ethics-opinions-local/2014opinions/2023-formal-opinion-2014-02. That such accommodations exist solely for resident attorneys further undermines Section 470's nonprotectionist rationale and demonstrates the existence of less-restrictive alternatives to the office requirement.

long rejected similar arguments in favor of a residency requirement on the grounds that a "nonresident lawyer's professional duty and interest in his reputation should provide the same incentive to maintain high ethical standards as they do for resident lawyers," and that the State, in any event, "has the authority to discipline all members of the bar, regardless of where they reside."[8] *Piper*, 470 U.S. at 286. Similarly, the Supreme Court has rejected the argument that an in-state office requirement is necessary to ensure the availability of attorneys for court proceedings as "unnecessary and irrational." *Frazier v. Heebe*, 482 U.S. 641, 649 (1987).[9] The Court noted that resident lawyers may still maintain their office outside of the state, thus making themselves equally unavailable to the courts, and that "there is no link between residency within a

---

[8] The Supreme Court's decision in *Friedman* is not to the contrary. The Court did not hold, as the majority asserts, Majority Op., ante at 28, that an office requirement would provide a "nonprotectionist alternative" to a residency requirement. Rather, in holding unconstitutional Virginia's residency requirement for admission on motion, the Court noted in dicta, without deciding the constitutionality of that alternative means, that an office requirement would be less restrictive. 487 U.S. at 70.

[9] The Court's holding was pursuant to its supervisory authority over the lower federal courts rather than the Privileges and Immunities Clause, *see id.*, but its reasoning is equally applicable here.

State and proximity to a courthouse."[10]  *Id.* at 650; *see also Barnard*, 489 U.S. at 553–54 (holding with respect to challenge under Privileges and Immunities Clause that unreliable airline and telephone service of Virgin Islands did not support a substantial justification for attorney residency requirement).

The majority, moreover, has not engaged in a meaningful analysis of the sufficiency of the State's proffered justifications, underscoring the extent of its departure from the established two-step inquiry under the Privileges and Immunities Clause.  Instead, the majority concludes that Schoenefeld's claim must fail at the threshold because, in its view, she has failed to prove that Section 470 was enacted for a protectionist purpose.  Even if such a *prima facie* showing is required, Schoenefeld has made one out based on the plain text and history of Section 470.

It is undisputed that, at the time Section 470 was enacted, it was part of a larger statutory scheme designed to prohibit nonresident attorneys from

---

[10] For example, an attorney practicing in Princeton, New Jersey would be far more accessible to New York City courts than an attorney located in Buffalo, New York.  With respect to attorneys who reside a great distance from the State, the Court in *Piper* suggested that they could be required to retain a local attorney for the duration of court proceedings and to be available to the court on short notice. *Piper*, 470 U.S. at 287.

18

practicing in New York. *See Richardson v. Brooklyn City & N.R. Co.*, 22 How. Pr. 368, 370 (N.Y. Sup. Ct. Feb. 1, 1862) (noting that the court "ha[d] always required that an attorney should reside within the state"). Chapter 43, the earliest predecessor to Section 470, provided a less burdensome, but still burdensome, exception to the overall residency requirement as an accommodation to commuters in adjacent states. *Rosenberg v. Johns-Manville Sales Corp.*, 416 N.Y.S.2d 708, 710 (Sup. Ct. 1979) (explaining with respect to Section 470 that "[t]he requirement of residence, as a condition to the continued right to practice, appears to have been ameliorated for attorneys who reside in an adjacent State, but only upon condition they maintain an office for the practice of law in this State"); *see also* Brennan, *Repeal Judiciary Law § 470*, 62 N.Y.S.B.J. 20, 21 (Jan. 1990) ("The primary purpose of chapter 43 was to carve out an exception to the general rule that an attorney could not practice in the New York State courts unless he was a resident of New York State."). The majority contends that this statutory context is irrelevant because Schoenefeld has not been burdened by the general ban on nonresident attorneys, which was invalidated under the Privileges and Immunities Clause in 1979. *See* Majority Op., *ante* at 20 (citing *In re Gordon*, 48 N.Y.2d 266 (1979)). That a discriminatory and burdensome requirement can be

stylized as an "exception" to an even more discriminatory and burdensome requirement, however, does not render it nondiscriminatory or render implausible a threshold inference of discriminatory purpose.[11]

The majority further reasons that because the office requirement, like the general ban on nonresident attorneys, was enacted in part to ensure an in-state place of service, *see Richardson*, 22 How. Pr. at 370, it does not exhibit a protectionist purpose. Majority Op., ante at 18–19. This gets it backward, however, for it is the State's burden to prove that service of process is a substantial interest justifying the restriction, not Schoenefeld's burden to prove that service of process was not a motivating concern for the statute. If the majority's rationale were sufficient, then any restriction based on residency, no

---

[11] The legislature's failure to amend or repeal Section 470 after New York's residency requirement was held unconstitutional, *see Gordon*, 48 N.Y.2d 266, 422 N.Y.S.2d 641, compounds, not alleviates, the constitutional problem, as the *Gordon* decision put the legislature on notice that the restrictions it placed on nonresident attorneys could be constitutionally problematic. Indeed, following *Gordon*, members of the legislature attempted, albeit unsuccessfully, to amend Section 470 to permit nonresidents to practice in New York without an office so long as they did not appear as the attorney of record. *See* J.A. 130–32. Regardless of whether that amendment would have effectively resolved the constitutional issue, its proponents were compelled by the conclusion that "*Gordon* and *Piper* . . . command elimination of residency requirements as a condition upon the right to practice law." J.A. 132.

matter how onerous, would pass constitutional muster so long as the State could point to a nonprotectionist purpose for the restriction. Were this the test, then there would have been no basis on which to invalidate in-state residency requirements for attorneys under the Privileges and Immunities Clause. *See, e.g.*, *Friedman*, 487 U.S. at 68 (rejecting as insufficient State's reasons for requiring residency of attorneys seeking admission on motion, including ensuring that those applicants "have the same commitment to service and familiarity with Virginia law that is possessed by applicants securing admission upon examination" and facilitating the full-time practice of law); *Piper*, 470 U.S. at 285 (rejecting State's argument that nonresident attorneys "would be less likely (i) to become, and remain, familiar with local rules and procedures; (ii) to behave ethically; (iii) to be available for court proceedings; and (iv) to do *pro bono* and other volunteer work in the State"); *accord Gordon*, 48 N.Y.2d at 274, 422 N.Y.S.2d at 646 (holding that State's justification for residency requirement, the "observ[ation] and evaluat[ion] [of] the applicant's character," was insufficient due to "alternatives which are less restrictive than denial of admission to practice which would further this interest").[12]

---

[12] In none of the above cases, moreover, did the courts dissect the legislative

Finally, the majority concludes that the burdensome effects of Section 470 on nonresident attorneys are not actually discriminatory because, by ensuring that every attorney that practices in New York has a "physical premises" in the State, the office requirement serves "to place resident and nonresident attorneys on an equal footing, not to favor the former over the latter." Majority Op., ante at 23. Thus, the majority faults Schoenefeld's supposed failure to demonstrate that Section 470 poses an "undu[e] burden," Majority Op., ante at 24, because she did not provide evidence to show that significant numbers of New York attorneys in fact practice from their homes rather than from offices or that a nonresident's burden of maintaining an office in New York is greater than a resident's burden of maintaining a home in New York. As a factual matter, the majority's conclusion that the law poses no undue burden on nonresident attorneys directly conflicts with our findings earlier in this case. *See Schoenefeld*, 748 F.3d at 468 ("This additional obligation [on nonresident attorneys] carries with it significant

---

history of the pertinent restrictions in order to discern a possible nonprotectionist purpose, as the majority does in this case. Rather, upon finding that the State's restrictions were discriminatory, the State was required in those cases to explain why, at that time, the restrictions were justified. *Cf. McBurney*, 133 S. Ct. at 1715–16 (examining plain text of Virginia statute to determine whether distinction between residents and nonresidents had a protectionist aim).

22

expense—rents, insurance, staff, equipment *inter alia*—all of which is in addition to the expense of the attorney's out-of-state office, assuming she has one.").[13] More importantly, these imagined burdens lose sight of the governing legal standard: "whether the State has burdened the right to practice law, a privilege protected by the Privileges and Immunities Clause, by discriminating among otherwise equally qualified applicants solely on the basis of citizenship or residency." *Friedman*, 487 U.S. at 66–67. Though the Clause "does not promise nonresidents that it will be as easy for [them] as for residents to comply with a state's law," *Schoenefeld*, 748 F.3d at 467 (internal quotation omitted), a "wholesale bar has never been required to implicate the [Clause]," *Crotty*, 346 F.3d at 95. Here, it is enough that Section 470 substantially burdens nonresident attorneys by requiring them, and only them, to maintain separate office premises within the State.

---

[13] Although the majority brushes aside these findings as "dicta," Majority Op., ante at 23 n.11, the significant burden on nonresidents of maintaining an in-state office was central to our determination that Section 470, if interpreted to impose an in-state office requirement, "discriminates against nonresident attorneys with respect to their fundamental right to practice law in the state and, by virtue of that fact, its limitations on non-resident attorneys implicate the Privileges and Immunities Clause." *Schoenefeld*, 748 F.3d at 469.

The majority asserts that Section 470 places all attorneys on equal footing because the statute is, in effect, no different from a law that requires all attorneys to maintain a "physical presence" in New York. *See* Majority Op., ante at 25. But unlike the statutes upheld as constitutional in *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1044–45 (10th Cir. 2009) and *Tolchin v. Supreme Court of N.J.*, 111 F.3d 1099, 1107–08 (3d Cir. 1997), which require all attorneys to maintain a physical presence within the State, Section 470 explicitly draws a distinction based on residency. This case is thus analogous to *Piper* and *Friedman*, where states' restrictions on legal practice that applied only to nonresidents were invalidated under the Privileges and Immunities Clause. *Friedman*, 487 U.S. at 70; *Piper*, 470 U.S. at 288. The Supreme Court, moreover, has long rejected the notion that a State's authority to pass a facially neutral law also empowers it to pass a discriminatory law. *Friedman*, 487 U.S. at 66–67 ("A state's abstract authority to require from resident and nonresident alike that which it has chosen to demand from the nonresident alone has never been held to shield the discriminatory distinction from the reach of the Privileges and Immunities Clause."). That New York could enact some other law that does not distinguish between residents and nonresidents is entirely inapposite to the question before us now.

## III.

The State of New York has chosen to discriminate against nonresident attorneys with regard to their right to pursue a common calling, and it has failed to provide a substantial justification for that discrimination. In holding to the contrary, the majority unnecessarily disturbs longstanding Privileges and Immunities jurisprudence and denies nonresident attorneys their constitutionally-protected right to practice law "on terms of substantial equality" with residents of New York. *Piper*, 470 U.S. at 280. For these reasons, I respectfully dissent.